PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-4574

_____

ROY LANGBORD; DAVID LANGBORD;
JOAN LANGBORD

v.

UNITED STATES DEPARTMENT OF THE TREASURY;
UNITED STATES BUREAU OF THE MINT; SECRETARY
OF THE UNITED STATES DEPARTMENT OF THE
TREASURY; ACTING GENERAL COUNSEL OF THE
UNITED STATES DEPARTMENT OF THE TREASURY;
DIRECTOR OF THE UNITED STATES MINT; CHIEF
COUNSEL UNITED STATES MINT; DEPUTY
DIRECTOR OF THE UNITED STATES MINT; JOHN DOE
NOS. 1 TO 10 "JOHN DOE" BEING FICTIONAL FIRST
AND LAST NAMES; UNITED STATES OF AMERICA

UNITED STATES OF AMERICA,

Third Party Plaintiff

v.

TEN 1933 DOUBLE EAGLE GOLD PIECES; ROY
LANGBORD; DAVID LANGBORD; JOAN LANGBORD,

Third Party Defendants

Roy Langbord, David Langbord, Joan Langbord,

Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-06-cv-05315)
District Judge: Honorable Legrome D. Davis

_____

Argued on November 19, 2014 before Merits Panel
Court Ordered Rehearing En Banc on July 28, 2015
Argued En Banc on October 14, 2015

Before: McKEE, *Chief Judge*, AMBRO, FUENTES,
SMITH, FISHER, CHAGARES, JORDAN, HARDIMAN,
VANASKIE, SHWARTZ, KRAUSE, and RENDELL,[*]
*Circuit Judges*.[**]

(Filed: August 1, 2016)

_____

[*] The Honorable Marjorie O. Rendell assumed Senior
Status on July 1, 2015.
[**] The Honorable Dolores K. Sloviter assumed inactive
status on April 4, 2016, after the argument and conference in
this case, but before filing of the opinion.

2

Barry H. Berke      [Argued]
Eric A. Tirschwell
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10032
      *Attorneys for Appellants*

Zane David Memeger
Robert A. Zauzmer  [Argued]
Jacqueline C. Romero
Nancy Rue
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
      *Attorneys for Defendants-Appellees*

_____

OPINION

_____

HARDIMAN, *Circuit Judge*, with whom AMBRO, FUENTES, SMITH, FISHER, CHAGARES, VANASKIE, and SHWARTZ, *Circuit Judges*, join.

This appeal presents a high-stakes dispute over ten pieces of gold. Joan Langbord and her sons, Roy and David Langbord, claim to be the rightful owners of the gold pieces while the Government claims they are property of the United States. Following a jury trial, the United States District Court for the Eastern District of Pennsylvania ruled in favor of the Government. The Langbords initially prevailed on appeal to this Court, but we vacated the panel opinion and agreed to

3

hear the case en banc. For the reasons that follow, we will affirm the District Court's judgment.

I

The ten gold pieces at issue—1933 Double Eagles with a face value of $20—were designed at the request of President Theodore Roosevelt by Augustus Saint-Gaudens shortly before the renowned sculptor's death in 1907. During the next twenty-five years, the United States Mint manufactured and circulated tens of millions of Double Eagles as legal tender. Things changed significantly for the Double Eagle during the Great Depression, however. Within days of his inauguration on March 4, 1933, President Franklin Delano Roosevelt signed a series of orders effectively prohibiting the Nation's banks from paying out gold. *See* Proclamation No. 2039, 48 Stat. 1689–91 (Mar. 6, 1933); Exec. Order No. 6073 (Mar. 10, 1933). Less than three months later, the United States went off the gold standard. *See* Exec. Order No. 6102 (Apr. 5, 1933); H.R.J. Res. 192, 73d Cong., 48 Stat. 112–13 (June 5, 1933). That same year, the United States Mint in Philadelphia struck 445,500 Double Eagles, but they were never issued. Instead, all but 500 of the 1933 Double Eagles were placed into the Mint's vault in June 1933. The remaining coins[1] were held by the Mint's Cashier;

---

[1] The parties dispute whether the 1933 Double Eagles are "coins." The Langbords claim they are coins because they bear official indicia of their use as instruments of stored value; the Government disagrees because they were never circulated. *See generally* 31 U.S.C. § 5312(a)(3) (defining "monetary instrument" as including "United States coins and currency"); Black's Law Dictionary 326 (4th ed. 1951) (defining a coin as "[p]ieces of gold, silver, or other metal,

4

of those, twenty-nine were destroyed in chemical reactions used to verify their metallic purity and two were sent to the Smithsonian Institution in October 1934.

By 1937, all of the 1933 Double Eagles held at the Philadelphia Mint were supposed to have been melted. This turned out not to be the case, however, as some coins were transferred among collectors, which prompted the Secret Service to begin investigating the matter in March 1944. The following year, the Secret Service recovered a small number of 1933 Double Eagles and determined that they had been stolen from the Mint by George McCann, who was the Mint's Cashier from 1934 to 1940. The Secret Service also concluded that the coins had been distributed by a Philadelphia merchant, Israel Switt, who was Joan Langbord's father (and grandfather to Roy and David Langbord).

Since 1944, the United States has attempted to locate and recover all extant 1933 Double Eagles. *See United States v. Barnard*, 72 F. Supp. 531, 532–33 (W.D. Tenn. 1947) (seeking replevin of a 1933 Double Eagle held by a private collector). The only exception has been a 1933 Double Eagle sold to King Farouk of Egypt in 1944 and later acquired in 1995 by Stephen Fenton, an English coin dealer. When Fenton attempted to resell that coin to a collector in New York, the Government seized it and a protracted legal dispute

_____

fashioned into a prescribed shape, weight, and degree of fineness, and stamped, by authority of government, with certain marks and devices, and put into circulation as money at a fixed value"). Without resolving this immaterial dispute, we refer to the 1933 Double Eagles as coins for ease of reference.

ensued. According to the Government, it agreed to resolve its dispute with Fenton because the Treasury Department had improvidently issued an export license for the coin when it was sold to King Farouk in 1944. The "Fenton-Farouk Coin" was sold at auction in 2002 to an anonymous buyer for $7,590,020 and the net proceeds were divided equally between Fenton and the Government pursuant to their settlement agreement.

Just over a year after the Fenton-Farouk Coin was sold at auction, Joan Langbord allegedly discovered ten 1933 Double Eagles in a family safe-deposit box. Her attorney, Barry Berke, who had represented Fenton in his dispute with the Government, contacted the Mint in an effort to resolve the Langbords' claim in the same way. After meeting with Mint officials, the Langbords agreed to turn the coins over for authentication but reserved "all rights and remedies." App. 806. The Mint took possession of the ten 1933 Double Eagles from Roy Langbord on September 22, 2004.

The Mint authenticated the coins in May 2005, but refused to return them to the Langbords. In July 2005, attorney Berke asked the Mint to reverse course in light of its treatment of other coins of questionable provenance and argued that "there [was] no basis for the government to seek forfeiture of the . . . 1933 Double Eagles." App. 911–13. A month later, the Mint rejected Berke's overture, writing:

> The United States Mint has no intention of seeking forfeiture of these ten Double Eagles because they are, and always have been, property belonging to the United States; this makes forfeiture proceedings entirely unnecessary. These Double Eagles never were

6

lawfully issued but, instead, were taken out of the United States Mint at Philadelphia in an unlawful manner. Indeed, the Langbord family was legally obligated to return this property to the United States . . . and will not be able to establish based on any reliable or admissible evidence how they currently possess, or ever possessed, title to this United States Government property.

App. 823.

Although the Mint had disclaimed any intention of forfeiting the coins, the Langbords responded in September 2005 by sending a "seized asset claim" to the Mint, invoking 18 U.S.C. § 983, a statute enacted by the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. No. 106-185, 114 Stat. 202, that contains procedural protections for those whose property is subject to forfeiture. The Mint returned the claim to the Langbords "without action." App. 837. In doing so, the Government argued that no seizure had occurred because "all 1933 Double Eagles are, and always have been, property belonging to the United States" and that the family had "voluntarily surrendered" the coins to the Mint. App. 837–38. In a series of missives exchanged in December 2005, the Langbords criticized the Mint for attempting to "rewrite history and create some kind of record a few days before the deadline for the government to either return the coins or institute a forfeiture action." App. 841. The Mint responded curtly that the parties had a "fundamental[] disagree[ment]." App. 848.

7

II

Unable to obtain relief through negotiation or administrative procedures,[2] the Langbords turned to the courts. In December 2006, they brought suit in the United States District Court for the Eastern District of Pennsylvania against the Mint, the Department of the Treasury, and various federal officials. The Langbords alleged violations of the United States Constitution, CAFRA, and the Administrative Procedure Act, as well as common law torts. They also sought a declaratory judgment to require the Government to comply with CAFRA either by returning the coins or by commencing a forfeiture proceeding. The Government filed motions to dismiss, but they were denied. The Government then filed an answer without asserting any counterclaims.

A

Following discovery, the parties filed cross-motions for partial summary judgment and the District Court rendered a split decision. *See Langbord v. U.S. Dep't of the Treasury*, 645 F. Supp. 2d 381, 401–02 (E.D. Pa. 2009).

The Langbords prevailed on both of their constitutional claims. The District Court first held that the Mint committed an unconstitutional seizure when it refused to return the coins to the Langbords. Citing *Mason v. Pulliam*, 557 F.2d 426, 429 (5th Cir. 1977), the Court reasoned that the Langbords' Fourth Amendment possessory rights to the ten

---

[2] After the Mint rejected their seized asset claim, the Langbords filed an administrative "damages claim" in May 2006. App. 851–56; *see also* 28 U.S.C. § 2675; 28 C.F.R. § 14.2. The Mint denied that claim as well.

8

Double Eagles were not vitiated by the Government's claim of ownership. *Langbord*, 645 F. Supp. 2d at 390–92. The seizure was unreasonable, the Court held, because the Government failed to obtain a warrant and its "superior property interest" did not "control the right of the Government to search and seize." *Id.* at 393–94 (quoting *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 304 (1967)). The District Court also found that the Langbords' Fifth Amendment due process rights were violated. After rejecting the Government's contention that the Mint had not seized "property" within the meaning of the Due Process Clause, the Court evaluated the factors established in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) and concluded that the Langbords were entitled to a predeprivation hearing before a neutral arbiter. *Langbord*, 645 F. Supp. 2d at 394–99.

Unlike its adjudication of their constitutional claims, the District Court rejected the Langbords' argument that the Government violated CAFRA by failing to comply with the statute's notice and claim procedures. In doing so, the Court held that CAFRA did not apply because the Mint's repossession of the coins was not tantamount to a nonjudicial (*i.e.*, administrative) forfeiture. *Id.* at 388–90. Despite CAFRA's inapplicability, the District Court nevertheless ordered the Government to "initiate a judicial forfeiture proceeding concerning the 1933 Double Eagles" as a remedy for the Mint's Fourth and Fifth Amendment violations, *id.* at 402, reasoning:

> Where a court concludes, as we have here, that the Government seized property without due process and intends to retain the property, we must "order the government to either return the

9

[property] to the plaintiffs or to commence judicial forfeiture . . . at which time the plaintiffs may raise whatever defenses are available to them."

*Id.* at 399 (quoting *Garcia v. Meza*, 235 F.3d 287, 292 (7th Cir. 2000)) (citing *United States v. Von Neumann*, 474 U.S. 242, 251 (1986); *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1334 (Fed. Cir. 2006); *United States v. Giraldo,* 45 F.3d 509, 512 (1st Cir. 1995)). Consequently, the District Court required the Government to file a judicial forfeiture action in accordance with the dictates of CAFRA. *Id.*

B

Before complying with the District Court's order to initiate a judicial forfeiture proceeding, the Government sought leave to allege three additional counts: replevin, declaratory judgment, and claims against John Does "to resolve ripening disputes concerning ownership of other 1933 Double Eagles," which "several individuals [are] rumored to have, or to have had." App. 1145–58. The District Court denied the Government's request to seek replevin, noting that "a property holder cannot bring a replevin claim seeking the return of property it already has." *Langbord v. U.S. Dep't of the Treasury*, 749 F. Supp. 2d 268, 274 (E.D. Pa. 2010). Likewise, the Court denied the Government's motion with respect to the John Doe claims because the events surrounding them were not "reasonably related" to the original claim as required by Rule 20 of the Federal Rules of Civil Procedure. *Id.* at 277–78.

The District Court did, however, permit the Government to seek a declaratory judgment that the coins

10

"were not authorized to be taken from the United States Mint and that therefore, as a matter of law, all of the 1933 Double Eagles remain property belonging to the United States." App. 1150; *see also Langbord*, 749 F. Supp. 2d at 271–72, 274–75 (treating the claim as a counterclaim). In doing so, the Court rejected the Langbords' contention that the Government's nearly four-year delay in seeking a declaratory judgment was "prejudicial," "undue," or in "bad faith." *Langbord*, 749 F. Supp. 2d at 272–76 (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Cureton v. NCAA*, 252 F.3d 267, 273 (3d Cir. 2001)). Instead, the District Court found the Government's delay was caused by a "misguided legal strategy," and that the Langbords were not prejudiced because they had previously "brought title issues into the mix" by asserting claims for replevin and conversion. *Id.* at 273, 275–76.

C

At this stage of the litigation, the positions of the parties were as follows. Consistent with the District Court's remedial order, the Government sought forfeiture of the ten 1933 Double Eagles and a declaration that it owned the coins. Meanwhile, the Langbords attempted to fend off the Government by arguing, *inter alia*, that "[f]orfeiture of the 1933 Double Eagles [was] barred by 18 U.S.C. § 983(a)(3)(B) because the government failed to file a complaint for forfeiture in the time allotted by [CAFRA]." App. 1296.

For two weeks in July 2011 the dispute was tried to a jury, which issued a verdict for the Government on its forfeiture claim. The Langbords sought judgment as a matter of law both at the close of the evidence and following the verdict. On August 29, 2012, the District Court denied the

11

Langbords' post-trial motion and entered judgment for the Government on its forfeiture claim. *Langbord v. U.S. Dep't of the Treasury*, 888 F. Supp. 2d 606, 637 (E.D. Pa. 2012). The Court also declared:

> The disputed Double Eagles were not lawfully removed from the United States Mint and accordingly, as a matter of law, they remain the property of the United States, regardless of (1) the applicability of CAFRA to the disputed Double Eagles, (2) Claimants' state of mind with respect to the coins; or (3) how the coins came into Claimants' possession.

*Id.* at 633–34. The Langbords filed a timely appeal to this Court; the Government did not file a cross-appeal.

D

On appeal, the Langbords challenged several orders of the District Court, as well as the jury verdict. A panel of this Court vacated "all orders at issue on appeal that postdate[d] the [District Court's] July 29, 2009 order, including the jury verdict and the . . . order entering judgment." *Langbord v. U.S. Dep't of the Treasury*, 783 F.3d 441, 445 (3d Cir. 2015). In addition, the panel remanded the case to the District Court with instructions to "return the [1933] Double Eagles to the Langbords." *Id.* at 458. Judge Sloviter dissented, opining that the coins should not be turned over to the Langbords because they belong to the Government. *Id.*

The United States filed a timely petition for rehearing en banc. In an order dated July 28, 2015, we granted the petition and vacated the panel opinion and judgment. Oral

arguments were heard on October 14, 2015, and the matter is ripe for disposition.

## III

The District Court had jurisdiction over the Langbords' claims under 28 U.S.C. §§ 1331, 1346, and 1361, and 5 U.S.C. § 702. It had jurisdiction over the Government's claims under 28 U.S.C. §§ 1345 and 1355. We have appellate jurisdiction under 28 U.S.C. § 1291.

## IV

The Langbords' appellate arguments can be summarized as follows: (1) the Government's forfeiture action was time-barred; (2) the District Court should not have decided the Government's declaratory judgment claim; (3) the District Court committed reversible errors with respect to the evidence; and (4) the jury instructions were erroneous. We address each argument in turn.[3]

## A

We turn first to the Langbords' argument that the Government's forfeiture action was time-barred. Under 18

---

[3] At various stages of this litigation, the Government has contended that it should not have been required to initiate forfeiture proceedings because the ten 1933 Double Eagles are, were, and always will be, property of the United States. This argument has some logical appeal, but regardless of its merits, the propriety of the District Court's order compelling judicial forfeiture is not before us because the Government did not appeal it.

U.S.C. § 983(a)(2)(A), "[a]ny person claiming property seized in a nonjudicial forfeiture proceeding under a civil forfeiture statute may file a claim with the appropriate official after the seizure." Assuming that the claim is timely and formally adequate, *see* 18 U.S.C. §§ 983(a)(2)(B) and (C), the statute provides:

> (A) Not later than 90 days after a claim has been filed, the Government shall file a complaint for forfeiture . . . or return the property pending the filing of a complaint, except that a court in the district in which the complaint will be filed may extend the period for filing a complaint for good cause shown or upon agreement of the parties.

> (B) If the Government does not . . . file a complaint for forfeiture or return the property, in accordance with subparagraph (A) . . . the Government shall promptly release the property pursuant to regulations promulgated by the Attorney General, and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense.

18 U.S.C. § 983(a)(3).

Consistent with this statutory scheme, the Langbords' argument is a straightforward syllogism: (1) they filed a seized asset claim which started § 983(a)(3)'s ninety-day period for the Government to file a forfeiture complaint; (2) the Government failed to file a forfeiture action or to obtain

14

an extension of time within ninety days; therefore, (3) the Government must return the coins to the Langbords.

While the logic of this syllogism is valid, it is based on a false premise, namely, that the Langbords' seized asset claim triggered CAFRA's ninety-day deadline. Although subsection (a)(2)(A) of § 983 allows a seized asset claim to be filed "after the seizure," it also requires that the claim be directed to "property seized *in a nonjudicial civil forfeiture proceeding*." *Id.* (emphasis added). This language presupposes that a nonjudicial forfeiture[4] is pending before a

---

[4] Nonjudicial (or administrative) forfeiture is one of three modes of forfeiture established by federal law, the other two being judicial forfeitures brought as civil *in rem* proceedings and criminal forfeitures. *See generally* Stefan D. Cassella, *Asset Forfeiture Law in the United States* 256 (2d ed. 2013) [hereinafter Cassella, *Asset Forfeiture*]. Nonjudicial forfeitures "entail[] no judicial involvement," *United States v. McGlory*, 202 F.3d 664, 669–70 (3d Cir. 2000), and "permit[] the United States to determine whether property in its custody is unclaimed, and, if it is, to take ownership without the trouble and expense of court proceedings," *Small v. United States*, 136 F.3d 1334, 1335 (D.C. Cir. 1998). CAFRA "superimposed" additional rules governing nonjudicial forfeitures, *see* Cassella, *Asset Forfeiture* 158, but the essential scheme has not changed since 1844—after providing sufficient notice, an authorized agency may, in the absence of a claimant willing to contest the action, issue a "declaration of forfeiture . . . [with] the same force and effect as a final decree . . . in a judicial forfeiture proceeding in a district court of the United States." 19 U.S.C. § 1609(b); *compare United States v. U.S. Currency in the Amount of $2,857.00*, 754 F.2d

proper seized asset claim can be filed. *See also In re Funds on Deposit*, 919 F. Supp. 2d 169, 172–77 (D. Mass. 2012); *Chaim v. United States*, 692 F. Supp. 2d 461, 465–66 (D.N.J. 2010); *United States v. 1866.75 Board Feet of Dipteryx Panamensis*, 587 F. Supp. 2d 740, 751 (E.D. Va. 2008). A contrary interpretation would render the emphasized statutory text "mere surplusage, a result we try to avoid," *Direct Mktg. Ass'n v. Brohl*, 135 S. Ct. 1124, 1132 (2015); *see also, e.g.*, *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2015) ("We assume . . . that every word in a statute has meaning and avoid interpreting one part of a statute in a manner that renders another part superfluous."). Given that property must be seized in a nonjudicial forfeiture proceeding before a seized asset claim triggers the Government's ninety-day period to respond, for the Langbords' argument to succeed, they would have to show that the Mint's retention of the coins initiated a nonjudicial forfeiture. As we shall explain, that was not the case.

Here, the Government determined that it was not obliged to initiate forfeiture proceedings against the 1933 Double Eagles because it had merely repossessed its own property. Consistent with this view, neither the Mint nor any other federal agency took any steps to initiate a nonjudicial forfeiture. In fact, the Government explicitly disclaimed any intent to forfeit the coins: "The United States Mint has no intention of seeking forfeiture of these ten Double Eagles because they are, and always have been, property belonging

---

208, 211–12 (7th Cir. 1985) (summarizing nonjudicial forfeiture pre-CAFRA), *with Malladi Drugs & Pharms., Ltd. v. Tandy*, 552 F.3d 885, 887–88 (D.C. Cir. 2009) (same but post CAFRA's enactment).

to the United States; this makes forfeiture proceedings entirely unnecessary." App. 823.[5] Instead, the Government asserted its ownership rights to the coins.

In reaction to the Government's assertion of ownership, the Langbords incongruously responded with a seized asset claim in an attempt to invoke protections afforded those whose property is being forfeited—a different subject matter. *See United States v. A Parcel of Land Known as 92 Buena Vista Ave.*, 507 U.S. 111, 125–26 (1993) (plurality opinion) (citing *United States v. Grundy*, 7 U.S. (3 Cranch) 337, 350–51 (1806) ("Until the Government does

---

[5] The Langbords claim that the Mint's letter constituted notice that initiated a nonjudicial forfeiture. We disagree because, although CAFRA does not specify the content of nonjudicial forfeiture notices, a letter that explicitly disavows any intent to initiate a forfeiture surely cannot suffice.

Nor do we agree with the Langbords that the Government "intended to achieve a nonjudicial forfeiture" because federal agencies besides the Mint thought pursuing forfeiture would be a prudent course of action, or because "subsequent communications to the Langbords made clear the government was retaining the Coins with the intent of permanently divesting the Langbords of their property without providing compensation or going to court." Langbord Br. 28–29. With respect to the former, it is true that most of the agencies involved recommended forfeiture, but it was the Mint's view that ultimately prevailed. And with respect to the latter, that argument is based on the erroneous premise that the Government's seizure of the 1933 Double Eagles sufficed to commence a nonjudicial forfeiture proceeding.

win . . . a judgment [of forfeiture], however, someone else owns the property.")); *id.* at 134 (Scalia, J., concurring) ("What the United States already owns cannot be forfeited to it."). While forfeiture is a process by which "[t]itle is instantaneously transferred to another," Black's Law Dictionary 722 (9th ed. 2009), an assertion of ownership presupposes that the party already has title. Thus, the Langbords' seized asset claim was akin to filing a petition for writ of habeas corpus on behalf of someone not in custody—mismatched and ineffective.

The Langbords counter that regardless of the agency's intentions and conduct, the Government nonetheless initiated a nonjudicial civil forfeiture proceeding when it seized the 1933 Double Eagles. We disagree for two reasons.

First, seizures and forfeitures are not the same. A "seizure" is "[t]he act or an instance of taking possession of . . . property by legal right or process." Black's Law Dictionary 1480 (9th ed. 2009). "Forfeiture," as previously noted, involves a transfer of title from one party to another. *Id.* at 722. As these definitions indicate, the essential difference between a "seizure" and a "forfeiture" is that in the former, the government obtains *possession* while in the latter it obtains *title* (*i.e.*, *ownership*). Government actors regularly seize property with the intention of returning it to the person from whom it was seized. *See, e.g.*, *United States v. Chambers*, 192 F.3d 374, 375–76 (3d Cir. 1999) ("It is well settled that the government is permitted to seize evidence for use in investigation and trial, but that such property must be returned once criminal proceedings have concluded, unless it

18

is contraband or subject to forfeiture.").[6] It follows that a seizure alone does not initiate a forfeiture proceeding because it does not implicate a transfer of legal title. *See 92 Buena Vista*, 507 U.S. at 125 ("It has been proved that in all forfeitures accruing at common law, nothing vests in the government *until some legal step shall be taken* for the assertion of its right . . . ." (emphasis added) (quoting *Grundy*, 7 U.S. (3 Cranch) at 350–51)); *cf. Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2428 (2015) (regulation vesting title to "reserve raisins" in the government constituted a "physical" taking under the Fifth Amendment even though "[r]eserve raisins are sometimes left on the premises of [private] handlers," who hold them "for the account of the [g]overnment" (internal quotation marks omitted)).

---

[6] To be sure, seizure of a putative *res* "has long been considered a prerequisite to the initiation of *in rem* forfeiture proceedings." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 57 (1993) (citing *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 84 (1992); *The Brig Ann*, 13 U.S. (9 Cranch) 289, 291 (1815)). But that fact implicitly recognizes the distinction between seizure and forfeiture, and the Supreme Court's opinion in *James Daniel Good*—permitting the Government to pursue forfeiture of real property in the absence of seizure—only reinforces the point. *See also* 18 U.S.C. § 985(b)(1)(A) (stating the general rule that "real property that is the subject of a civil forfeiture action shall not be seized before entry of an order of forfeiture").

Second, we have impliedly rejected the Langbords' argument twice before. *See Mantilla v. United States*, 302 F.3d 182 (3d Cir. 2002); *United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141 (3d Cir. 2003). In *Mantilla*, we considered a putatively time-barred forfeiture of money seized by the Customs Service during an undercover drug sting. *See* 302 F.3d at 184 (case proceeding under 19 U.S.C. § 1621). We observed that Customs failed to institute a nonjudicial forfeiture within the five-year statute of limitations and simply "deposited the funds into its undercover operation account." *Id.* Almost eight years after the seizure, the claimant filed an action to recover the seized funds raising an issue under 28 U.S.C. § 2401. Under this statute, the claimant had a six-year statute of limitations running from when the "right of action first accrues" to file his suit against the government to claim his property. *Id.* at 184. In deciding whether the claimant's action was timely, we held that the six-year period under § 2401 started "at the close of forfeiture proceedings," or "if no forfeiture proceedings were conducted, at the end of the five-year limitations period during which the government is permitted to bring a forfeiture action." *Id.* at 186 (quoting *Polanco v. DEA*, 158 F.3d 647, 654 (2d Cir. 1998)). This holding effectively applied an eleven-year limitations period starting from the date of seizure to hold the claimant's cause of action timely. *See id.* Had the government's seizure of the drug money commenced a "de facto" forfeiture, a six-year period would have applied.

One year after *Mantilla* we applied the same principle against the government. In *$8,221,877.16 in U.S. Currency*, we rejected the government's argument that it commenced a forfeiture proceeding within the applicable statute of limitations simply by seizing funds it believed to be the

20

proceeds of drug trafficking. 330 F.3d at 157–61. In that case, the government sought forfeiture of the defendant funds under 18 U.S.C. § 984, which permits the United States to pursue the forfeiture of "fungible property" (such as money) without tracing the property to particular unlawful transactions. 330 F.3d at 158–59. This type of forfeiture comes with a caveat: a "forfeiture action in rem" under § 984 must be "commenced" within one year of the offense "that is the basis for the forfeiture." *Id.* at 158 (quoting 18 U.S.C. § 984 (2000)). The government argued that its seizure of the funds was sufficient to toll the statute of limitations, but we disagreed, holding the "commencement" of a forfeiture action under § 984 requires the filing of a judicial forfeiture complaint. *Id.* at 159–60.

We acknowledge that *Mantilla* and *$8,211,877* were not decided under CAFRA and do not squarely answer the question of when a "nonjudicial civil forfeiture proceeding" begins under the statute.[7] Nevertheless, these decisions plainly recognized—contrary to the Langbords' contention here—that a seizure is neither the same as a forfeiture nor does it automatically trigger forfeiture proceedings. *See also Dusenbery v. United States*, 534 U.S. 161, 163 (2002) (observing that the FBI started the nonjudicial forfeiture process more than two years after the property was seized); *Taylor v. United States*, 483 F.3d 385, 386–87, 389 (5th Cir. 2007) (citing *Barrera-Montenegro v. United States*, 74 F.2d 657, 658 (5th Cir. 1996) (stating that the DEA began

---

[7] CAFRA applies only to forfeitures commenced on or after August 23, 2000. *United States v. One "Piper" Aztec*, 321 F.3d 355, 358 (3d Cir. 2003).

nonjudicial forfeiture proceedings a month after the property was seized and chronicling the agency's various forms of notice it provided that such a proceeding had been initiated)); *United States v. Miscellaneous Firearms*, 376 F.3d 709, 711–12 (7th Cir. 2004) (stating that the ATF commenced a nonjudicial forfeiture by sending a letter to the defendant notifying him of his rights forty-four days after the property was seized); *United States v. Dusenbery*, 201 F.3d 763, 765–66 (6th Cir. 2000) (noting that the publication of notice of intent to forfeit starts the nonjudicial forfeiture process); *Boero v. DEA*, 111 F.3d 301, 304–05 (2d Cir. 1997) (same); *United States v. Clark*, 84 F.3d 378, 380 (10th Cir. 1996) (discussing the FBI's methods of notifying the defendant of its intent to forfeit money it had previously seized); *Floyd v. United States*, 860 F.2d 999, 1008 (10th Cir. 1988) (noting that forfeiture proceedings did not begin until notice was given despite a seizure taking place at an earlier date); *United States v. U.S. Currency in the Amount of $2,857.00*, 754 F.2d 208, 211–12 (7th Cir. 1985) (stating that forfeitures begin with the publication of notice after seizure).[8]

For the reasons stated, we reject the Langbords' premise that the Government initiated a "nonjudicial civil forfeiture proceeding" subject to CAFRA's ninety-day deadline. Accordingly, the District Court did not err when it ordered the Government to pursue a *judicial* forfeiture of the

---

[8] The Government invites us to hold that nonjudicial forfeitures under CAFRA commence when it sends notice of its intent to forfeit the property. We need not reach this issue because the Government took no steps to forfeit the 1933 Double Eagles.

22

1933 Double Eagles to remedy the Government's constitutional violations.[9]

B

We next consider the Langbords' three challenges to the District Court's declaratory judgment. First, they claim that CAFRA is a special statutory proceeding that prohibits the Government from seeking a declaratory judgment. Second, they argue that if a declaratory judgment action were

[9] Our dissenting colleagues claim that our decision will "allow the Government to nullify CAFRA's provisions at will" on its "say-so that it owns" the disputed property. Dissent Op. 1. Not so. "CAFRA's purpose is '[t]o provide a more just and uniform procedure for Federal civil *forfeitures*.'" Dissent Op. 5 (emphasis added). Accordingly, CAFRA applies when the government invokes its forfeiture power. Permitting the government to pursue its ownership rights does not eviscerate CAFRA's procedural protections for persons whose property is subject to forfeiture because the rules governing both are different. *Cf. United States v. Craig*, 694 F.3d 509, 512 (3d Cir. 2012) (distinguishing criminal restitution from forfeiture). Those who dispute the government's claim of ownership have recourse to common law remedies, such as replevin, which were available long before CAFRA was enacted and which CAFRA did nothing to displace. In this case, the Government made no efforts to institute a nonjudicial forfeiture proceeding, going so far as to explicitly disclaim the intent to do so. Under these circumstances, the Government failed to trigger CAFRA's procedures not by its "say-so," but by its conduct.

appropriate, it had to be submitted to a jury. Finally, they contend it was an abuse of discretion for the District Court to allow the Government to seek a declaratory judgment nearly four years after the litigation began.

1

The Langbords argue that CAFRA constitutes a special statutory proceeding that precludes the entry of a declaratory judgment. *See* Fed. R. Civ. P. 57 advisory committee's note to 1937 amendment ("A declaration may not be rendered if a special statutory proceeding has been provided for the adjudication of some special type of case . . . ."). We need not decide this question of first impression, however, because even if CAFRA were a special statutory proceeding, our conclusion would be the same: the Government's declaratory judgment action was permissible.

The problem for the Langbords is that if CAFRA were a special statutory proceeding, it would only preclude declaratory judgments that affect forfeiture. In this case, the Government did not seek a declaratory judgment *in lieu of* forfeiture; it did so in an attempt to quiet title to the Double Eagles *in addition to* the court-ordered judicial forfeiture proceeding. While the declaratory judgment action did turn on a similar factual predicate as the forfeiture claim (*i.e.*, that the coins were stolen or embezzled), it used this fact to establish an independent legal theory, namely, that the Government was attempting to regain possession of what it believed to be its own property. As the District Court persuasively reasoned:

24

> [A]lthough CAFRA could be considered the prosecutor's remedy, the forfeiture proceeding only resolves one of the two open questions in this case: were the Double Eagles stolen from the Mint and/or possessed by individuals who knew they were stolen, rendering them forfeitable under 18 U.S.C. § 641? If the United States does not meet its burden on the forfeiture count, whether the Langbords are the legal owners of the Double Eagles remains unanswered because a second question—did the Langbords ever obtain legal title to the Double Eagles by virtue of their leaving the Mint through authorized channels?—would remain. The declaratory judgment count provides a mechanism for determining the answer to the second inquiry, relevant because of the United States' second role as previous lawful owners— and according to the United States, perpetually lawful owners—of the Double Eagles.

*Langbord v. U.S. Dep't of the Treasury*, 798 F. Supp. 2d 607, 610 (E.D. Pa. 2011).

In sum, because such a theory does not implicate forfeiture, it could not be precluded by any special procedures of CAFRA. To hold otherwise would prevent the Government from seeking a declaratory judgment in its capacity as a property owner, which would have the untenable effect of putting the United States in a worse position than a civilian property owner—a position at odds with longstanding precedent. *Cf. United States v. California*, 332 U.S. 19, 40 (1947) ("[O]fficers who have no authority at all to dispose of Government property cannot by their conduct cause the

Government to lose its valuable rights by their acquiescence, laches, or failure to act."); *United States v. Steinmetz*, 973 F.2d 212, 222–23 (3d Cir. 1992).

For these reasons, the District Court did not err in allowing the Government to seek a declaratory judgment that the coins are the property of the United States.

2

The Langbords also contend that once the Government's declaratory judgment action was allowed to proceed, it should have been submitted to the jury. To answer this question, we ask whether the declaratory judgment action fits within the pattern of cases typically decided by a court sitting in equity or whether the case presents an "inverted law suit" brought by one who would have been a defendant at common law, which would be for the jury to decide. *See Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1189 (3d Cir. 1979). In adjudicating this question, "federal not state law is determinative." *Id.* (citing *Simler v. Conner*, 372 U.S. 221, 222 (1963) (per curiam)).

We perceive no error in the District Court's conclusion that the Government's declaratory judgment claim fits the equitable pattern of an action to quiet title. As the District Court found: "Here, the Government possesses the coins and claims rightful ownership, but the Langbords' assertion that the Double Eagles legally belonged to Israel Switt and were legally inherited by the Langbord Claimants clouds the Government's title." *Langbord*, 798 F. Supp. 2d at 611. We agree that such a claim is analogous to a claim to quiet title. *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1250 (3d ed. 2016)

26

(describing quiet title, traditionally, as an action brought by a plaintiff who alleges both ownership and possession of property for which she seeks to uncloud title).

The Langbords challenge this conclusion, arguing that Pennsylvania law does not provide for an action to quiet title to personal property. In their view, the absence of a Pennsylvania counterpart to a suit in equity means that the Government's declaratory judgment is more akin to an action in replevin—a cause of action resolved by juries. We disagree, principally because the Langbords' reliance on Pennsylvania law is misplaced. Determining whether a declaratory judgment action is tried before a jury is a question of federal, not state law. *Owens-Illinois*, 610 F.2d at 1189; *see also Simler*, 372 U.S. at 222 ("[T]he right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions."). Thus, we look to whether the "basic character" of the suit sounds in equity under federal law. *See Simler*, 372 U.S. at 222–23; *Owens-Illinois, Inc.*, 610 F.2d at 1189. And here it clearly does—fitting the pattern of a quiet title action. *See* 28 U.S.C. § 2410(a); 28 U.S.C. § 1655; *cf. Hoelzer v. City of Stamford*, 933 F.2d 1131, 1135–36 (2d Cir. 1991) (deciding a quiet title action for personal property without submitting the case to a jury).

The Langbords next argue that the Government's declaratory judgment claim should have been submitted to the jury because, had the Government not unconstitutionally seized the coins, it would have been forced to try a replevin action to a jury. We decline the Langbords' invitation to engage in a hypothetical analysis. In this case, the District Court remedied the Government's impermissible seizure of the coins by ordering a forfeiture action to be filed and did not require that the coins be returned to the Langbords. The

Langbords essentially ask us to supplement this remedy by asserting that we should determine whether the Government's declaratory judgment should have gone to a jury based on the premise that the Langbords retained possession of the coins. And they do so without citing precedent or explaining why the remedy given by the District Court should be displaced on appeal. Even if we were to find merit in the Langbords' contention, it does not follow that had the Government not seized the coins, it would have been forced to bring a replevin action. The Government would have had other options. For example, it could have authenticated the coins, returned them to the Langbords, and then seized the coins pursuant to a warrant before bringing an action to quiet title. In sum, we see no good reason to supplement the District Court's remedy and we reject the Langbords' implicit claim that the unconstitutional seizure was the "but for" cause of the absence of a jury trial.

Lodging one final attack on the Court's decision not to submit the declaratory judgment to the jury, the Langbords contend that they reserved the right to a jury trial when they relinquished the coins to the Mint for authentication with the proviso that they "reserved all rights." Whatever rights the Langbords reserved, it would be passing strange for us to conclude that the right to be sued in replevin was one of them. Because the Government was under no obligation to file *any* action in replevin and had other means to attempt to prove title to the coins, the Langbords were not entitled to a jury trial on the Government's declaratory judgment claim.

3

The Langbords' final challenge to the District Court's declaratory judgment is that the Government forfeited the

28

claim by failing to add it to its counterclaim in a timely manner. The Federal Rules of Civil Procedure allow for the liberal amendment of pleadings and the decision whether such leave should be granted is "committed to the 'sound discretion of the district court.'" *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 629 (3d Cir. 2013) (quoting *Cureton*, 252 F.3d at 272). As such, we review a district court's determination only for abuse of discretion. *Id.*

"A district court may deny leave to amend . . . if a plaintiff's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the opposing party." *Cureton*, 252 F.3d at 272–73. The mere passage of time "is an insufficient ground to deny leave to amend." *Id.* Nevertheless, "at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Id.* at 273 (internal quotation marks omitted) (quoting *Adams v. Gould Inc.*, 739 F.2d 858, 868 (3d Cir. 1984)). In furtherance of this analysis, courts "focus on the movant's reasons for not amending sooner." *Id.*

Here, the Langbords contend the District Court abused its discretion by allowing the Government to add its declaratory judgment claim after the case had been progressing for nearly four years. In their view, the request to amend should have been denied because the Government had no good reason not to amend sooner.

Our review of the record leads us to conclude that the District Court committed no error when it allowed the Government to amend its counterclaim. Agreeing with the Langbords' arguments in many respects, the District Court found that the Government's delay "though significant, was

29

not undue." *Langbord*, 749 F. Supp. 2d at 275. In particular, the District Court noted that the Government did not have a good reason for its delay because its proffered excuse seemed like a "strategic choice." *Id.* The Court then proceeded to consider all the other factors that inform the "undue delay" analysis. Specifically, the Court found that the claim for declaratory judgment "neither introduce[d] new factual issues nor revive[d] irrelevant disputes." *Id.* at 273, 275. Rather, it involved matters the Langbords themselves had put at issue in their complaint—claims that were still unresolved at the time the Government sought leave to amend. *Id.* Thus, the Court found the amendment would put the Langbords in "no worse a position had the Government brought th[e] counterclaim" along with its initial answer. *Id.* And for that reason, the Court concluded the amendment would neither prejudice the Langbords, nor place an unwarranted burden on the Court. *Id.* In so finding, the Court concluded that the Government's amendment presented no undue delay. *Id.* at 275. As we have noted in previous cases, the District Court here "'had considerable familiarity with the development of the factual and legal issues' and 'carefully analyzed the [defendant's] proffered reasons for delay, the prejudice to [the plaintiffs], and the substance of the amended complaint.'" *CMR D.N.*, 703 F.3d at 631 (quoting *Cureton*, 252 F.2d at 274). We see no reversible error in its discretionary decision.

C

The Langbords next claim they are entitled to a new trial because the District Court committed various evidentiary errors. They contend: (1) Secret Service reports were erroneously admitted; (2) documents related to *United States v. Barnard*, 72 F. Supp. 531 (W.D. Tenn. 1947), should have been excluded; (3) evidence related to Israel Switt's prior

arrest and forfeiture of gold should not have been admitted; and (4) certain testimony of the Government's expert witness, David Tripp, should have been excluded. We find no error in admitting the evidence related to *Barnard* and Switt's prior forfeiture, but we agree with the Langbords that portions of both the Secret Service reports and Tripp's testimony should have been excluded. After examining the entire record of the case, however, we hold that those evidentiary errors were harmless.

1

We begin by examining the admission of a number of Secret Service reports dating back to the 1930s and 1940s. These documents were admitted under the "ancient documents" exception to the hearsay rule, which provides that "[a] statement in a document that is at least 20 years old and whose authenticity is established" is "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness." Fed. R. Evid. 803(16); *see also* Fed. R. Evid. 901 (providing rules governing the authentication of ancient documents). The Langbords argue that the District Court erred in admitting these documents because they contained hearsay within hearsay and the Court did not require them to satisfy the multiple-hearsay rule, Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

As the District Court observed, courts have disagreed about whether the multiple-hearsay rule applies to statements made in ancient documents. *Compare United States v. Hajda*, 135 F.3d 439, 443–44 (7th Cir. 1998) ("[If] the [ancient] document contains more than one level of hearsay, an

31

appropriate exception must be found for each level."); *Hicks v. Charles Pfizer & Co.*, 466 F. Supp. 2d 799, 805–07 (E.D. Tex. 2005) ("Even if a document qualifies as ancient under Rule 803(16), other hearsay exceptions must be used to render each individual layer of hearsay admissible."); *United States v. Stelmokas*, 1995 WL 464264, at \*6 (E.D. Pa. Aug. 2, 1995), *with Langbord v. U.S. Dep't of the Treasury*, 2011 WL 2623315, at \*16 (E.D. Pa. July 5, 2011) (citing *Murray v. Sevier*, 50 F. Supp. 2d 1257, 1264 n.6 (M.D. Ala. 1999), *vacated on other grounds by Murray v. Scott*, 253 F.3d 1308 (11th Cir. 2001); *Gonzales v. N. Twp. of Lake Cty.*, 800 F. Supp. 676, 681 (N.D. Ind. 1992), *rev'd on other grounds*, 4 F.3d 1412 (7th Cir. 1993); *Ammons v. Dade City*, 594 F. Supp. 1274, 1280 n.8 (M.D. Fla. 1984); 2 John W. Strong et al., *McCormick on Evidence* § 323 (5th ed. 2003)). *See generally* Gregg Kettles, *Ancient Documents and the Rule Against Multiple Hearsay*, 39 Santa Clara L. Rev. 719, 752–60 & nn.161–63 (1999). In our view, stronger precedent supports the application of Rule 805 to ancient documents.

We are particularly persuaded by the analysis of the United States District Court for the Eastern District of Pennsylvania in *United States v. Stelmokas*. In that case, Judge DuBois held that ancient documents were subject to Rule 805 because "hearsay statements contained within an ancient document lack the same indicia of trustworthiness and reliability that provide the rationale for admitting statements when the declarant is the author of the ancient document." 1995 WL 464264, at \*6. The court noted that the exception "is based on a rationale that authenticated ancient documents bear certain indicia of trustworthiness," namely: (1) a lack of motive to fabricate due to the document's age; (2) the writing requirement "minimizes the danger of mistransmission"; and

(3) "the document is more likely to be accurate than the oral testimony of the declarant based on his memory of events of twenty or more years ago." *Id.* at *5 (citing 2 John W. Strong et al., *McCormick on Evidence* § 322 (4th ed. 1992); Charles E. Wagner, *Federal Rules of Evidence Commentary* 452 (1993); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(16)(1) (1994)). While these indicia of trustworthiness justified admitting the ancient document as such, they did *not* justify admitting hearsay statements contained therein:

> [T]here is no guarantee that a hearsay statement contained in the [ancient document] is accurate. The author of the ancient document may have misheard or misunderstood the hearsay statement or his written words may not convey the meaning intended by the hearsay declarant. These issues of perception and narration are not merely peripheral but are fundamental problems of hearsay evidence.

*Id.* at *6; *see also* Daniel J. Capra, *Electronically Stored Information and the Ancient Documents Exception to the Hearsay Rule: Fix It Before People Find Out About It*, 17 Yale J.L. & Tech. 1, 9 n.32 (2015) ("[T]he ancient documents exception does not abrogate the rule on multiple hearsay imposed by Rule 805—at least in the view of right-thinking courts.").[10]

---

[10] Since 1996, Professor Capra has been the Reporter for the Judicial Conference's Advisory Committee on the Federal Rules of Evidence. The Rules Committee recently proposed to eliminate the ancient documents exception to the

The District Court and the Government rely principally on treatises that disagree with the multiple-hearsay rule's application out of fear that requiring a separate exception for each level of hearsay would eviscerate the ancient documents exception. *See Langbord*, 2011 WL 2623315, at *16–17; Gov't Br. 40–41; *see also* 30C Michael H. Graham, *Federal Practice and Procedure* § 7057 n.1 (2014) (stating that requiring establishment of a different hearsay exception for the embedded hearsay statements "would effectively emasculate Rule 803(16)'s utility as it did in *Hicks*"). Alternatively, the District Court reasoned that the multiple-hearsay rule was satisfied because "Rule 803(16) supplies the grounds by which each level within an ancient document becomes admissible." *Langbord*, 2011 WL 2623315, at *17. We are unpersuaded, largely because the rationale justifying the ancient documents exception does not apply to the admission of hearsay statements embedded within the documents. *Stelmokas*, 1995 WL 464264, at *5–6.

We therefore hold that the District Court abused its discretion by admitting the hearsay embedded within Secret

rule against hearsay in a draft Committee Note published on August 14, 2015. *See* Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Amendments to the Federal Rules of Evidence (Aug. 14, 2015), *available at* http://www.uscourts.gov/file/18375/download. The draft Committee Note bluntly asserts that "[t]he exception was based on the flawed premise that the contents of a document are reliable merely because the document is old" and the rule "could have once been thought tolerable out of necessity." *Id.* at 25–26.

Service reports into evidence without applying Rule 805. In so holding, we emphasize that this error does not render the Secret Service reports inadmissible *in toto*. Rather, first-level hearsay remains admissible as Rule 805 does not apply to those statements and their use is permitted by Rule 803(16) (the ancient documents exception).

2

The Langbords' second evidentiary objection concerns the introduction of the opinion and findings of fact from *United States v. Barnard*, 72 F. Supp. 531 (W.D. Tenn. 1947). In *Barnard*, the United States filed a replevin action against a coin collector to recover a 1933 Double Eagle and the judge found that the coin at issue had not left the Philadelphia Mint legally. 72 F. Supp. at 532. On initial review of the *Barnard* documents in the Langbords' case, the District Court found them admissible under the ancient documents exception to the hearsay rule. *Langbord*, 2011 WL 2623315, at *5. But after examining them under Federal Rule of Evidence 403, the Court found the documents admissible only for two purposes: to demonstrate that Israel Switt had notice that the coins were stolen and to help the jury evaluate expert David Tripp's testimony under Federal Rule of Evidence 703. *Id.* at *5–6.

On appeal, the Langbords insist that the *Barnard* documents should have been excluded for four reasons. Their first objection—that the documents were hearsay—is a nonstarter for the obvious reason that they were not offered to prove the truth of their contents. *See* Fed. R. Evid. 801(c)(2).

Second, the Langbords claim that the *Barnard* documents, even if not hearsay, should have been excluded

because they were irrelevant. In their view, the Government was unable to prove Switt was aware of the *Barnard* opinion because it could not show that he read either the opinion, news articles discussing the opinion, or an article about the case in *The Numismatist* (a journal for coin dealers). As such, the *Barnard* opinion could not have put Switt on notice that holding the 1933 Double Eagles was illegal. As we shall explain, these arguments do not satisfy the high bar for establishing irrelevance.

Evidence is relevant so long as it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Sriyuth*, 98 F.3d 739, 745 (3d Cir. 1996) (quoting Fed. R. Evid. 401). "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b). To determine whether the Government has met this burden, "[t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Huddleston v. United States*, 485 U.S. 681, 690 (1988).

In light of all the evidence, the District Court did not abuse its discretion by determining that a jury could reasonably find by a preponderance of the evidence that Switt was aware of the *Barnard* documents. This is true for several reasons. First, the Government presented evidence that Switt was in the business of dealing coins and had dealt in 1933 Double Eagles. Second, Switt was questioned by the Secret Service and had been tied to the coin at issue in *Barnard*. Finally, the case made national news and was discussed in *The Numismatist*.

36

The Langbords argue alternatively that the *Barnard* documents should have been excluded under Federal Rule of Evidence 403 because their probative value was outweighed by their prejudicial impact. According to the Langbords, the documents lacked probative value because, if not taken for their truth, they could show only that the Government believed that the coins were stolen and sought to recover them. In other words, the Government's *belief* that the coins were stolen could not provide Switt with *knowledge* that they were, in fact, stolen. Thus, they were minimally probative of Switt's notice that he could not lawfully possess the coins.

The Langbords have not satisfied the exacting standard of Rule 403. We may overturn a district court's decision under this rule only if "it is 'arbitrary and irrational.'" *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187 (3d Cir. 1990) (quoting *United States v. DePeri*, 778 F.2d 963, 973–74 (3d Cir. 1985)). Even if we were to credit the Langbords' distinction between "Switt's knowledge" and the "Government's belief," the *Barnard* documents are nonetheless probative of Switt's knowledge because they provided some notice of the dubiousness of one's right to possess a 1933 Double Eagle because the United States had actively sought their return as stolen government property. And this probative value was not substantially outweighed by the risk of unfair prejudice, especially in light of the fact that the District Court instructed the jury as to how the *Barnard* evidence could be used.

Finally, the Langbords claim the District Court abused its discretion by admitting the *Barnard* documents under Federal Rule of Evidence 703 because the Government's expert, David Tripp, neither explicitly mentioned *Barnard* as evidence underlying his opinion nor referred to it in

explaining his conclusions. In fact, Tripp did refer to *Barnard* while summarizing his opinion and the material underlying that opinion.[11] And Tripp's testimony and its context demonstrate that he used *Barnard* as a basis for his opinion. Because this is precisely what Rule 703 anticipates, we find no abuse of discretion.[12]

---

[11] Immediately after Tripp mentioned *Barnard*, the Langbords asked for an instruction on the use of the opinion. The Court obliged and explained the purpose of the *Barnard* evidence.

[12] The Langbords lodge one more challenge against the *Barnard* documents, arguing that even if they were admissible, the Government improperly invoked them in a manner that invited the jury to consider them for their truth. This allegedly occurred on five occasions: twice by Tripp, who referred to the case as showing that the Langbord coins were illegally taken from the Mint instead of the *Barnard* coin, and on three other occasions during the Government's closing argument.

In regard to the two Tripp statements, neither commit the mistake alleged by the Langbords. When read in context, both statements discuss the *Barnard* opinion alone and do not assert that the decision is determinative of the propriety of the Langbords' claim to the Double Eagles at issue here. Further tempering any such concerns, the District Court described the role of expert witnesses and explained that the *Barnard* evidence adverted to by Tripp could be used only to evaluate the basis upon which he grounded his opinion and was not determinative of the Langbords' case. This limiting instruction helped ensure that the jury understood the proper purpose of Tripp's use of the *Barnard* evidence.

For all the reasons stated, we hold the District Court did not err in admitting the *Barnard* documents.

3

Next, the Langbords contend that evidence that Israel Switt forfeited 98 gold coins that he possessed in contravention of the Gold Reserve Act of 1934 should have been excluded. The Government sought to introduce documents from this forfeiture to prove that Switt was aware of the repercussions of holding coins illegally and that he was motivated to conceal 1933 Double Eagles.

The Langbords argue that the District Court abused its discretion by admitting this evidence for three reasons: (1) it was improper character evidence used to show Switt had a propensity to unlawfully hoard coins; (2) it was not relevant as the prior forfeiture took place under the Gold Reserve Act while this forfeiture was brought under CAFRA; and (3) even if the past forfeiture was relevant, its probative value was outweighed by its unfair prejudice.

As for the Government's alleged misuse of the evidence during closing arguments, the Langbords did not object to the Government's three references to the *Barnard* documents in its closing. We find no plain error because the Langbords' substantial rights were not affected and the comments did not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159, 166 (3d Cir. 2015) (quoting *Nara v. Frank,* 488 F.3d 187, 197 (3d Cir. 2007)). These three brief comments were made before the District Court cured any possible confusion by explaining in a detailed manner to what extent the *Barnard* documents could be considered.

Federal Rule of Evidence 404(b) prohibits the use of information regarding an individual's prior bad acts as evidence that the person has the propensity to act in such a manner. Of course, prior bad acts may be admitted for purposes other than propensity. Fed. R. Evid. 404(b)(2). The Government contends that evidence of Switt's prior forfeiture of 98 gold coins demonstrated his knowledge that it forfeits illegally held coins and provided a motive to conceal 1933 Double Eagles to avoid this fate. We agree. Accordingly, these two uses of the evidence from Switt's prior forfeiture do not go to his propensity and therefore were not excludable under Rule 404(b).

With proper purposes identified, the Government must then demonstrate that the evidence it seeks to introduce is relevant for those purposes—meaning that it had "any tendency" to make a consequential fact "more or less probable than it would be without the evidence," Fed. R. Evid. 401; *see also, e.g.*, *United States v. Caldwell*, 760 F.3d 267, 277–78 (3d Cir. 2014). The Langbords insist the Government failed to do so because the forfeiture Switt suffered was effectuated under the Gold Reserve Act while this forfeiture proceeded under CAFRA. They also emphasize that the Gold Reserve Act allowed the Government to forfeit coins possessed in contravention of the Act, while CAFRA permits the forfeiture of stolen goods. Thus, having coins forfeited for possessing them against the dictates of the Gold Reserve Act is not probative of either notice to Switt that the Government also forfeits stolen coins or Switt's motivation to conceal the coins to avoid this type of forfeiture. We disagree.

While Switt's prior forfeiture and the one at issue here do arise from different legal bases, the fact that Switt had previously forfeited gold coins to the Government is relevant

to his knowledge that holding gold coins may be unlawful under certain circumstances. His prior loss of gold coins through a forfeiture proceeding also made it more likely that Switt would conceal any other coins he possessed for fear of losing them as well.

Nor was this evidence excludable under Rule 403 balancing. In support of their contention that the evidence's unfair prejudice exceeded its probative value, the Langbords point to various instances where the evidence was used at trial. Langbord Br. 58–60. In particular, they direct us to the facts that the Government: (1) mentioned Switt's prior arrest on too many occasions; (2) stated Switt was "known to the Secret Service," "knew how to deal with law enforcement," "was angry with the Government," wanted to "thumb his nose at the Government," and failed to relinquish his gold coins in the manner "all other citizens did;" and (3) elicited expert testimony on two occasions that Switt failed to carry out his patriotic duty by not turning the coins over to the Government. Langbord Br. 58–59. According to the Langbords, these uses demonstrate the prejudice posed by the evidence and it should have been excluded outright.

While posing some prejudice to the Langbords, we cannot conclude that the District Court's determination that such prejudice failed to outweigh the evidence's probative value was "arbitrary and irrational." *Bhaya*, 922 F.2d at 187 (quoting *DePeri*, 778 F.2d at 973–74). In deciding to admit the evidence over the Langbords' objection, the District Court carefully weighed its probative value and possible prejudicial impact. The Court found the fact that the evidence spoke to Switt's knowledge and motivation at the time in which the Double Eagles were allegedly concealed particularly probative as to whether a violation of 18 U.S.C. § 641

41

occurred. *Langbord*, 2011 WL 2623315, at \*5–6. With that said, the Court acknowledged that some prejudice would inure, but determined that the balance tipped in favor of admitting the evidence. *Id.* at \*8. This quintessential judgment call by the District Court was not an abuse of discretion.

4

For their final evidentiary objection, the Langbords assert that the Government's expert, David Tripp, transmitted inadmissible hearsay to the jury without drawing upon any specialized knowledge and that this hearsay's probative value did not substantially outweigh its prejudicial effect. Langbord Br. 60–62 (citing Fed. R. Evid. 702, 703; *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)). Specifically, the Langbords cite Tripp's statements regarding *Barnard*, his testimony about Switt's prior forfeiture, and his summaries of the Secret Service reports we discussed previously.

We turn first to the Langbords' argument that Tripp's testimony was not supported by specialized knowledge. We have interpreted Federal Rule of Evidence 702 to impose a "trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The third of these requirements, "fit," is at issue here. In order to satisfy that requirement of Rule 702, an "expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Id.*; *see also* Fed. R. Evid. 702(a) (stating as a condition for admitting an expert's testimony that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"); *United States v. Ford*, 481 F.3d

42

215, 218–19 (3d Cir. 2007). To the Langbords, Tripp was a mere conduit for transmitting inadmissible hearsay to the jury by reading documents to them. We disagree.

As a historian, the tools of Tripp's trade include old documents regarding past events such as the *Barnard* opinion, accounts of Switt's prior forfeiture, and the Secret Service reports. To fulfill his role as an expert witness, Tripp was obliged to help the jury understand the historical background of the 1933 Double Eagles. He did so by "'surveying a daunting amount of historical sources,' evaluating their reliability and providing a basis for 'a reliable narrative about that past.'" *United States v. Kantengwa*, 781 F.3d 545, 562 (1st Cir. 2015) (quoting Alvaro Hasani, *Putting History on the Stand: A Closer Look at the Legitimacy of Criticisms Levied Against Historians Who Testify as Expert Witnesses*, 34 Whittier L. Rev. 343, 354–55 (2013)). And while the Langbords are correct that Tripp read portions of his source material verbatim to the jury, the excerpts he chose from voluminous historical materials provided context and explained past events. *See id.*; *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135–36 (2d Cir. 2013) (noting that "synthesiz[ing] dense or voluminous historical texts" and offering "context that illuminates or places in perspective past events" are proper uses of historical expertise). Unlike in *Mejia*, where an expert's testimony was found inadmissible because he merely summarized law enforcement's straightforward investigation against the defendant as a shortcut to proving the elements of the crime without synthesis, *see Mejia*, 545 F.3d at 190–91, 194–98, Tripp's testimony synthesized disparate and voluminous historical sources and provided the jury his opinion on the fate of the

1933 Double Eagles. There was no error in allowing Tripp to testify in this manner.

Next, we consider the Langbords' related argument that Tripp's testimony contained inadmissible hearsay that should have been excluded under Federal Rule of Evidence 703. That Rule provides that an expert may base his opinion on otherwise inadmissible evidence so long as other "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." This inadmissible information may be disclosed to the jury only if its "probative value in helping the jury evaluate the opinion substantially outweighs [its] prejudicial effect." Fed. R. Evid. 703. As provided by the Committee Notes to the 2000 amendments to Rule 703, courts need not engage in this latter balancing inquiry if the facts or data at issue are "admissible for any other purpose" aside from "assist[ing] the jury to evaluate the expert's opinion."

On this point, most of the Langbords' arguments evaporate in light of our preceding analysis. As we have already discussed, the first-level hearsay found in the Secret Service reports, the *Barnard* opinion, and information related to Switt's prior forfeiture are all admissible. Because they are admissible for a purpose other than "assist[ing] the jury to evaluate" Tripp's opinion, we need not engage in the Rule 703 balancing inquiry and Tripp was free to convey the information to the jury.

Nevertheless, one portion of the Langbords' argument survives—the challenge to Tripp's invocation of the embedded hearsay contained in the Secret Service reports that we previously held inadmissible. And we agree with the Langbords that this testimony's probative value did not

substantially outweigh its prejudicial impact. While probative, the testimony was cumulative because it recounted interviews and reports that were later compiled into a final report that contained their most important information in admissible form—*i.e.* that the coins were stolen from the Mint and landed in Switt's possession. At the same time, this testimony posed additional prejudice to the Langbords because it included speculation and characterization of events by out-of-court declarants that was adverse to the Langbords' position. For this reason, we find that it was an abuse of discretion to permit Tripp to testify to the embedded hearsay within the Secret Service reports.

5

While we have found evidentiary errors regarding portions of the Secret Service reports and portions of Tripp's testimony about them, a new trial is appropriate only when "a substantial right of the party is affected." *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 180 (3d Cir. 2000) (quoting *Glass v. Phila. Elec. Co.*, 34 F.3d 188, 191 (3d Cir. 1994)); *see also* Fed. R. Evid. 103(a). We find such an error harmless when there is a "high probability" that the discretionary error did not contribute to the verdict. *McQueeny v. Wilmington Trust Co.*, 779 F.2d 916, 924–25 (3d Cir. 1985). Our review of the entire record leads us to conclude that the Government was able to clearly and convincingly prove the elements of its case without reliance on the tainted evidence. Accordingly, for the reasons we shall explain, we conclude that the evidentiary errors were harmless.

a

To prevail on its forfeiture action, the Government needed to prove the Double Eagles "constitue[d] or [were] derived from the proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. § 1956(c)(7)])," 18 U.S.C. § 981(a)(1)(C). "Specified unlawful activity" under § 1956(c)(7) includes stealing or embezzling "a thing of value of the United States" or receiving, concealing, or retaining such an item with the intent to convert it to one's own use while knowing it was the product of theft or embezzlement. *See* 18 U.S.C. § 1956(c)(7)(D); *id.* § 641; *Morissette v. United States*, 342 U.S. 246, 263, 279 (1952). Thus, the Government had to prove that: (1) the Double Eagles were things of value; (2) they were stolen or embezzled; and (3) whoever stole or embezzled the coins knew he was doing so or whoever received, concealed, or retained the coins knew that they were stolen or embezzled and nonetheless intended to use them for personal gain. Only the second and third elements are disputed and the Government's admissible evidence in this case clearly established both.

b

The evidence at trial demonstrated overwhelmingly that no 1933 Double Eagle ever left the Mint through authorized channels and any that did were either stolen or embezzled. Within 24 hours of his inauguration on March 4, 1933, President Roosevelt issued a proclamation that banned the payout of gold coin from banks and the Treasury. On March 9, Congress codified this presidential order. Not until six days later, on March 15, 1933, did the first 1933 Double Eagles arrive at the Cashier's office of the Philadelphia

46

Mint—the office that serves as the "gatekeeper," taking newly minted coins and releasing them to the public. A few weeks later, on April 5, 1933, President Roosevelt issued another proclamation ordering that all gold in private hands be returned to the Government.[13] And on January 30, 1934, Congress passed the Gold Reserve Act which stated that all gold was to be nationalized and the Government's holdings were to be melted into gold bars.

The aforementioned legal framework dictated that no 1933 Double Eagles could lawfully be issued to the public. The coins arrived at the Cashier's office after Congress had forbidden the payout of gold. And any coins that left the Mint were required to have been returned under the direction of President Roosevelt's April 5 proclamation. The next year, by January 30, 1934, all the coins were ordered to be melted.

The Langbords nonetheless contend that 1933 Double Eagles may have left the Mint because of miscommunication or mistake. In particular, they point to a window of time between March 7 and April 12, 1933, during which the coins may have left the Mint via innocent means. On March 7, an Assistant Treasury Secretary informed the Mint that gold coin or bars could be issued in exchange for bullion. This information was at odds with President Roosevelt's inaugural

---

[13] This proclamation contained an exception that allowed collectors to retain coins of rare or unusual interest. This exception would not have applied to the 1933 Double Eagles when the proclamation was issued, however, because the fact that the coins were being struck by the hundreds of thousands made the 1933 Double Eagles neither rare nor unusual—a fact on which both the Government's and Langbords' experts agreed.

proclamation and Congress's March 9 codification of that proclamation. And the Mint was not instructed in a letter from the Treasury to halt gold exchanges until April 12, 1933. The parties (and their experts) therefore dispute whether gold intended for private use could have left the Mint during this time. But regardless of whether this window actually existed, the Mint's own records from the relevant years show that no 1933 Double Eagle ever left the Mint through authorized channels.

The Mint's records track the movement of each 1933 Double Eagle. These records were remarkably detailed, going so far as to show the payment of three pennies and their year of minting in one transaction. The records indicate that 445,500 Double Eagles were struck. Five hundred of those were sent to the Cashier, while the remaining 445,000 were sealed in a basement vault. Of the 500 held in the Cashier's office, 29 were destroyed in tests to determine the coins' purity and weight, 2 were sent to the Smithsonian, and the remaining 469 were placed in the basement vault. Then, in accordance with the Gold Reserve Act of 1934, the 445,469 coins left in the vault were ordered melted into gold bars. By this accounting, it is clear that not a single 1933 Double Eagle was ever authorized to be issued to the public—a fact to which both a 1933 Double Eagle historian and a forensic accountant testified.

The Langbords try mightily to discredit these records, but fail to do so in a meaningful way. They claim the records are not reliable for three reasons. First, they argue that Mint employees "disregarded regulations governing quality control and bookkeeping audits," Langbord Br. 14, as evidenced by the fact that the Cashier failed to properly select coins for the

assay process,[14] and that the Mint's holdings and records may not have been audited as frequently as regulations required. Neither of these concerns raises serious reliability questions—selecting the *right* coin for the assay process has little to do with the *number* of coins held by the Mint and the absence of a timely audit of the Mint's holdings does not indicate that the records actually contain errors.

Second, the Langbords note the fact that Mint records show the release of only four 1933 Eagles (not Double Eagles) while more than that are privately held today. Without more, this fact does little to discredit the records. These alleged errors do not involve 1933 Double Eagles and the lost 1933 Eagles may not have been logged in the Mint records because they too may have left the Mint illegally.

And finally, the Langbords argue that the records fail to show the release of gold coins on certain dates when other documents show that disbursements did in fact occur. As the Government explained at trial, however, this argument is factually incorrect because the documents to which the Langbords refer show only that individuals *asked* for gold coin in return for deposits of gold bullion, not that gold coin was actually paid out.[15] Mint regulations corroborate the

---

[14] An "assay" is a scientific process used by the Mint to test the purity of the gold contained in a given coin. The process results in the destruction of the tested coin.

[15] The Langbords also offer the possibility that 1933 Double Eagles mistakenly left the Mint through "unclassified counter cash" which was not broken down by denomination. In support of this argument, the Langbords cite a statement made by David Tripp in a deposition in which he indicated that gold coins may have been part of this counter cash. At

Government's theory by stating that gold would be paid out only if requested and available—otherwise, requests would be fulfilled by check.

Beyond the Mint records, the Government introduced evidence to show that the coins were either stolen or embezzled. In particular, the Government pointed to a Secret Service report regarding its investigation following the appearance of 1933 Double Eagles after all the coins should have been destroyed. The report's final conclusion stated that, in the opinion of the Secret Service, none of the 1933 Double Eagles that had surfaced ever left the Mint through authorized channels. Thus, the Secret Service report and the Mint records reflect the same conclusion that the 1933 Double Eagles had left the Mint illegally.[16]

---

trial, however, Tripp stated that additional research led him to the conclusion that gold coins were in fact not part of the counter cash and that 1933 Double Eagles could not have left the Mint via that manner. While the Langbords dispute this point, the fact of the matter remains that the Mint records account for every 1933 Double Eagle and do not show that any one of them left the Mint through authorized channels.

[16] The relevant portion of the Secret Service's final report does not contain multiple hearsay. *See* App. 5025 ("The matter having been discussed [with Mint officials] . . . the opinion prevails that all of the [1933 Double Eagles] known to be in unauthorized circulation are the property of the Government."). Rather, it recounts the conclusion of the Secret Service investigators, which is first-level hearsay admissible under the ancient documents rule.

In sum, considering the record as a whole, we have no doubt that any evidentiary errors were harmless as they relate to the jury finding that the coins were either stolen or embezzled from the Mint.

c

Next, the Government was required to show that whoever stole or embezzled the coins knew he was doing so or whoever received, concealed, or retained the coins, knew that the coins were stolen or embezzled and nonetheless intended to use them for his own gain. In light of the passage of so many decades, it is unsurprising that direct evidence of intent is lacking in this case. Such evidence is not required, however, because "a jury may draw inferences of subjective intent from evidence of . . . objective acts, and from circumstantial evidence." *United States v. Piekarsky*, 687 F.3d 134, 147–48 (3d Cir. 2012). Here, there is overwhelming circumstantial evidence in support of the Government's case.

For starters, we recall the evidence which shows that no 1933 Double Eagle ever left the Mint through authorized channels. And if the Mint never meant to issue the coins, its records show they were never issued, and the Secret Service concluded none were authorized to leave the Mint, it follows that the illicit taking and retention of the coins is the only plausible explanation for how ten 1933 Double Eagles ended up in the safe-deposit box of Israel Switt's heirs.

The Government's evidence did not stop there. Turning back to the reports from the Secret Service's investigation of 1933 Double Eagles that surfaced in the 1940s, the Government showed that Israel Switt was interviewed by Secret Service agents to determine his

51

connection to the coins that had left the Mint. That investigation led the Secret Service to conclude that all of the Double Eagles that made it into private hands were connected to Switt. The fact that Switt had been involved in the dissemination of 1933 Double Eagles and that he had been investigated by the Secret Service for doing so provide strong evidence that he knew the coins were stolen or embezzled and that the Government sought their return.

Moreover, the Government pointed to *Barnard* and related documents as providing a reason to think Switt knew the Double Eagles were stolen or embezzled. Those documents—the publication of the opinion in 1947, a news report covering the case in the *New York Times*, and an article in *The Numismatist* about the matter—all make it more likely that Switt would have been aware of the controversy surrounding the legality of holding 1933 Double Eagles.

Finally, yet another body of evidence points to Switt knowing the coins were stolen or embezzled: the documents demonstrating that the Government forfeited 98 gold coins Switt possessed in contravention of the Gold Reserve Act of 1934. This forfeiture showed that Switt had knowledge that holding gold coins was impermissible and could result in adverse government action. It also evidences Switt's motive to conceal the coins.

Taking all of this evidence together, the Government showed that Switt knew that the 1933 Double Eagles were embezzled or stolen and that it was illegal to possess them. Yet they were stored in a safe-deposit box for decades until his daughter disclosed their whereabouts soon after the Fenton-Farouk coin was auctioned for $7,590,020. These circumstances are more than sufficient to find a violation of

52

18 U.S.C. § 641 and renders the District Court's evidentiary errors harmless.

D

The Langbords' last line of attack on the District Court's judgment is that the Court erroneously instructed the jury on two elements of the Government's forfeiture case. First, they claim the District Court improperly instructed the jury on the *mens rea* necessary to establish liability under 18 U.S.C. § 641. Second, they argue that the District Court should have required the jury to find a violation of § 641 occurring after 1948, the year of the statute's enactment.[17]

1

In *Morissette*, the Supreme Court held that, in the absence of an express intent requirement in § 641, Congress "borrow[ed] terms of art in which are accumulated the legal tradition and meaning of centuries of practice," and that a conviction under the statute requires a jury to find "the criminal intent . . . *wrongfully* to deprive another of possession of property." 342 U.S. at 263, 276 (emphasis added); *see also, e.g.*, *United States v. Crutchley*, 502 F.2d

---

[17] We review the District Court's refusal to give a requested jury instruction for abuse of discretion. *See United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011). "Where a party properly objects to a jury instruction under [Federal Rule of Civil Procedure] 51, we exercise plenary review to determine whether the instruction misstated the applicable law." *Collins v. Alco Parking Corp.*, 448 F.3d 652, 655 (3d Cir. 2006) (citation omitted).

1195, 1201 (3d Cir. 1974) (stating that the "essential part of the common law larceny-type offense" was that "the thief . . . knew [that the property he took] did not belong to him" (quoting *United States v. Howey*, 427 F.3d 1017, 1017–18 (9th Cir. 1970)); *United States v. Caverly*, 408 F.2d 1313, 1320 n.5 (3d Cir. 1969).

The District Court's instructions conveyed exactly this point of law. The Court instructed the jury that it was required to find that "whoever stole or embezzled [the 1933 Double Eagles] did so *knowingly*," and that "to steal means to take *somebody else's property* without permission with the intention of permanently keeping it." App. 2702 (emphasis added) (also defining embezzlement as "to knowingly and intentionally take somebody else's property with the intent to permanently keep it by virtue of your employment or your position of trust").

The Langbords nevertheless contend that the District Court misstated the law when it further elaborated that "knowingly means that you're conscious and aware of what you're doing. Right? It means that you're exercising a choice, a deliberate choice. It's not an accident. It's not a mistake." App. 2702. We disagree.

As an initial matter, the District Court's definition of "knowingly" accords with our model instruction. *See* Third Circuit Model Criminal Jury Instruction 5.02 (revised Apr. 2015) ("knowingly" means that the defendant was "*conscious and aware* of the nature of [his or her] actions and of the surrounding facts and circumstances, as specified in the definition of the offense(s) charged" (emphasis added)). And in conjunction with the District Court's definition of "steal," the jury was required to find that whoever took the coins was

54

"conscious and aware" that they were "somebody else's property." App. 2702 (also stating that the jury was required to find "improper" or "guilty knowledge"). Of course, taken in isolation, the definition of knowingly—because it does not specify *what* knowledge is required—could simply require mere intentionality of the kind rejected in *Morissette*. But we do not review jury instructions in isolation as the Langbords tacitly propose. *See, e.g.*, *Limbach Co. v. Sheet Metal Workers Int'l Ass'n, AFL–CIO*, 949 F.2d 1241, 1258–59 n.15 (3d Cir. 1991) ("When interpreting jury instructions, the reviewing court considers the totality of the instructions and not a particular sentence or paragraph in isolation.").[18] The

---

[18] The Langbords also insist the District Court erred by refusing to instruct the jury that a violation of § 641 had to be "willful." A linguistic "chameleon," *see, e.g.*, *United States v. Starnes*, 583 F.3d 196, 210 (3d Cir. 2009) (citing *Bryan v. United States*, 524 U.S. 184, 191 & n.12 (1998)), the word "willful" is not found in the statute. It is therefore unsurprising that a number of our sister circuits have declined to promulgate model instructions that include a willfulness charge. *See* Committee on Pattern Jury Instructions, District Judges Association, Fifth Circuit, Pattern Jury Instructions (Criminal Cases) 180–82 (2015) (Instruction No. 2.27); Committee on Federal Criminal Jury Instructions of the Seventh Circuit, Pattern Criminal Jury Instructions of the Seventh Circuit 196–98 (2012); Judicial Committee on Model Jury Instructions for the Eighth Circuit, Manual of Model Criminal Jury Instructions for the District Courts of Eighth Circuit 221–22 § 6.18.641 (2014) (revised Aug. 5, 2014); Ninth Circuit Jury Instructions Committee, Manual of Model Criminal Jury Instructions 178–79 (2010) (Instruction Nos. 8.39 and 8.40); Criminal Pattern Jury Instruction Committee

District Court properly instructed the jury on the *mens rea* required by § 641.

2

The Langbords' last objection concerns the District Court's instruction that a theft under § 641 rendering the 1933 Double Eagles subject to forfeiture could have occurred "some time in the past." App. 2702. The Langbords claim that the jury should have been instructed that it was required to find a theft occurring after 1948, the year Congress enacted the statute. This contention betrays a misunderstanding of the

---

of the United States Court of Appeals for the Tenth Circuit, Criminal Pattern Jury Instructions 119–20 (2011) (revised Sept. 10, 2015); *see also* Committee on Pattern Jury Instructions of the Judicial Council of the Eleventh Circuit, Pattern Jury Instructions (Criminal Cases) 36, 177–79 (2010) (dividing willfulness offenses into those with an ordinary general intent requirement, and "highly technical [offenses] that present the danger of ensnaring individuals engaged in apparently innocent conduct").

The District Court accordingly did not abuse its discretion in declining to give the Langbords' requested charge to the jury. *See United States v. Croft*, 750 F.2d 1354, 1362 (7th Cir. 1984) ("[N]o particular verbal formula or talismanic combination of words is required to properly allege the element of specific intent . . . under 18 U.S.C. § 641."). We also note that the Langbords' proposed definition of willfulness—requiring knowledge of unlawfulness—does not differ meaningfully from the "guilty knowledge" that the District Court required the jury to find. *See* App. 2702.

interplay between 18 U.S.C. §§ 981 and 1956(c)(7), and the retroactive application of civil statutes.

In addition to reforming several procedural aspects of civil asset forfeiture, CAFRA vastly expanded the scope of property subject to forfeiture by amending 18 U.S.C. § 981(a)(1)(C)—the statute authorizing forfeiture in this case—to include "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7))." *See* Pub L. No. 106-185, § 20, 114 Stat. 202, 224 (2000); *United States v. All Funds Distributed to Weiss*, 345 F.3d 49, 52–53 & n.2 (2d Cir. 2003) (observing that prior to CAFRA's inclusion of "specified unlawful activity" in § 981(a)(1)(C), the Government could seek forfeiture only through a violation of the money laundering statutes, 18 U.S.C. §§ 1956, 1957, and 1960, listed in § 981(a)(1)(A)). Then, as now, § 1956(c)(7) provided that "[t]he term 'specified unlawful activity' means . . . an offense under . . . section 641 (relating to public money, property, or records)."

The question thus arises whether CAFRA's amendment to § 981(a)(1)(C) permits the Government to pursue the forfeiture of property previously not "subject to forfeiture" but made so by the Act. In *United States v. One "Piper" Aztec*, 321 F.3d 355 (3d Cir. 2003), we addressed a related question with respect to CAFRA's imposition of the burden of proof on the Government to prove forfeiture under 18 U.S.C. § 983(c). In that case, our analysis under *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994), was not particularly difficult because Congress "clear[ly] and unambiguous[ly]" set forth the enactment's temporal scope by providing a retroactivity clause. 321 F.3d at 358 & n.3. Specifically, Congress stated that "[CAFRA] and the amendments by [CAFRA] shall apply to any forfeiture

proceeding commenced on or after [August 23, 2000]." Pub. L. No. 106-185, § 21, 114 Stat. 202, 225 (2000); 8 U.S.C. § 1324 (note). We therefore held that the Government's heightened burden applies only in civil forfeitures "commenced on or after [August, 23, 2000]." 321 F.3d at 357–58.

So too here. As illustrated by *One "Piper" Aztec*, CAFRA's retroactivity clause is the beginning and end of the *Landgraf* analysis in this case because only one date is relevant to CAFRA's applicability: August 23, 2000.[19] *See*

---

[19] CAFRA's retroactivity clause is also why the Langbords' focus on § 641's year of enactment is inapposite. In passing CAFRA, Congress was aware that entire swaths of new property would become subject to forfeiture due to conduct occurring prior to CAFRA's effective date, pursuant to various criminal statutes that were themselves enacted "some time in the past." Nonetheless, the legislature did not single out any these myriad dates of enactment, and instead tied CAFRA's application only to the date of its own enactment.

We are also unpersuaded by the Langbords' reliance on *United States v. Eleven Vehicles*, 836 F. Supp. 1147 (E.D. Pa. 1993). At issue in that case was a version of 18 U.S.C. § 981(a)(1)(A) that rendered forfeitable "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation . . . of section 1956 or 1957 of [title 18], or any property traceable to such property." 836 F. Supp. at 1151. Sections 1956 and 1957 are money laundering statutes that were enacted in the Money Laundering Control Act of 1986, Pub. L. No. 99-570, §§ 1352, 1366, 110 Stat. 3207-18, 3207-35. That statute, unlike CAFRA, did not include a provision

58

321 F.3d at 357–58. For this reason, we hold that CAFRA's amendment to § 981(a)(1)(C) applies to property made forfeitable by conduct occurring prior to the Act. Accordingly, for predicate offenses already listed in § 1956(c)(7) at the time CAFRA was passed—such as § 641—we need only look to whether the Government filed its

specifying an effective date, much less a retroactivity clause. 836 F. Supp. at 1156 & n.11; *see also* Pub. L. No. 99-570, § 1364, 110 Stat. 3207-34–35. Furthermore, § 981(a)(1)(A) required (and still requires) a "violation" of either § 1956 or § 1957. Thus, the court in *Eleven Vehicles* determined the statutes' effective date to be the date of their enactment, October 27, 1986, and declined to permit retroactive forfeitures thereunder. In contrast, CAFRA not only includes a retroactivity clause, but is broadly phrased to permit the forfeiture of "proceeds traceable to . . . any offense *constituting* 'specified unlawful activity,'" which includes "an offense *under* . . . section 641." 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(D) (emphasis added).

Finally, to the extent that the Langbords' retroactivity argument suggests that the Government's forfeiture action depends on actions that were *not* criminal at the time they were taken, we disagree with their factual premise. As *Morissette* makes clear, although § 641 was enacted in 1948, the statute had "no other purpose . . . than to collect from scattered sources crimes so kindred as to belong in one category." 342 U.S. at 266–67. Thus, the fact that § 641 did not exist until 1948 does not mean that "embezzl[ing], steal[ing], or purloin[ing] . . . property of the United States" was lawful activity prior to that date. *Id.* at 266 n.28.

forfeiture complaint on or after August 23, 2000. *Id.* With respect to the ten 1933 Double Eagles at issue in this case, the Government filed its forfeiture complaint in 2009. App. 1162–82. Thus, "our inquiry is done." *One "Piper" Aztec*, 321 F.3d at 358. The District Court's jury instructions were proper.

*     *     *

This case is unique for many reasons. It involves iconic American gold pieces that apparently had lain dormant in a safe-deposit box for decades. Almost immediately after the 1933 Double Eagles surfaced in 2002, the right to possess and own them was vigorously disputed. The resolution of that dispute required the District Court to consider novel questions of constitutional, statutory, and common law. The able trial judge worked diligently through all of the issues and gave both sides a fair trial. Once the jury had spoken, the District Court declared that the 1933 Double Eagles had always been property of the United States. Although the benefit of hindsight has convinced us that certain errors were committed in the conduct of the trial, they did not affect the outcome. We will affirm the judgment of the District Court.

JORDAN, *Circuit Judge*, concurring in part and concurring in the judgment:

———————————————————

I agree with the excellent opinion of the Majority in all but one respect. Like Judge Rendell and those joining her partial dissent, I cannot join Part IV.A of the Majority Opinion. I have serious doubts about the Majority's assertion that there was no nonjudicial forfeiture proceeding here and, hence, I also question the conclusion that CAFRA does not apply. Nothing in CAFRA or, to my knowledge, elsewhere in the United States Code specifies how a "nonjudicial forfeiture proceeding" actually begins. Although the government asserts, and the Majority agrees, that there were no such proceedings here, the language of CAFRA suggests otherwise.

Of particular note is 18 U.S.C. § 983(a)(1)(A)(iii). Under that section, when the government obtains a criminal indictment with an allegation that the property is subject to forfeiture before the 60-day period for notice has expired,[1] it has two choices concerning its notice obligation: (1) "send

———————————————————

[1] As the Majority lays out, *see* Majority Op. at 14, CAFRA provides that the government generally has 60 days from the date of seizure to send to interested parties written notice of the seizure and its intent to forfeit the property, at which point a claimant may file a seized asset claim. *See* 18 U.S.C. § 983(a)(1)(A); 19 U.S.C. § 1607(a). If a seized asset claim is filed, the nonjudicial forfeiture cannot proceed, and the government then has 90 days to file a complaint for judicial forfeiture or to return the property pending the filing of a complaint. 18 U.S.C. § 983(a)(3)(A).

1

notice within the 60 days and *continue* the nonjudicial civil forfeiture proceeding under this section"; or (2) "*terminate* the nonjudicial civil forfeiture proceeding" and use the criminal forfeiture laws. 18 U.S.C. § 983(a)(1)(A)(iii) (emphasis added). Both verbs – "continue" and "terminate" – presuppose that a nonjudicial civil forfeiture proceeding has already begun, even though no "notice" designated as such may have been provided. In addition, § 983(e)(1) provides that "[a]ny person entitled to written notice in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute who does not receive such notice may file a motion to set aside a declaration of forfeiture with respect to that person's interest in the property … ." That section similarly assumes the existence of a nonjudicial forfeiture proceeding, even though the government has not yet sent something designated as a "notice" to verify its intent to pursue forfeiture.

That is not to say that no notice is necessary. Some manifestation of the intent to keep the seized property is needed. The Code of Federal Regulations provides that an "administrative forfeiture proceeding"[2] commences, as relevant here, "when the first personal written notice" of the seizure is sent to interested parties. 28 C.F.R. § 8.8. The Majority makes the footnoted assertion, at the government's urging, that, "although CAFRA does not specify the content of nonjudicial forfeiture notices, a letter that explicitly disavows any intent to initiate a forfeiture surely cannot

---

[2] The regulations define an "administrative forfeiture" as "the process by which property may be forfeited by a seizing agency rather than through a judicial proceeding," and provide that the term "nonjudicial forfeiture" as used in § 983 bears the same meaning. 28 C.F.R. §§ 8.2, 9.2.

2

suffice." (Majority Op. at 17 n.5.) I disagree. In my view, the simple omission of the word "forfeiture" from the government's notice – when that notice did in fact assert the functional equivalent of a forfeiture – does not avoid the deadlines and protections of CAFRA. When (as here) the government seizes property, asserts its title, and tells the previous owner that it will never return the property, that should surely suffice to trigger a "nonjudicial forfeiture proceeding."[3]

It is noteworthy that, in teaching Department of Justice attorneys the proper contours of forfeiture policy, the 2016 Department of Justice Asset Forfeiture Policy Manual cautions its attorneys not to use formalistic distinctions to try to bypass CAFRA's statutory deadlines. That manual provides that, even though CAFRA's 90-day deadline may not apply to property subject only to judicial forfeiture, in a case involving such seized property, "the prosecutor should treat [a seized asset claim] as if it were a 'claim' referred to in section 983(a)(3)(A) …, and should thus commence a judicial forfeiture action within 90 days of the receipt of the request." Department of Justice Asset Forfeiture and Money Laundering Section, *Asset Forfeiture Policy Manual* at 58 (2016), *available at* https://www.justice.gov/criminal-afmls/

---

[3] Further, the government's claim that it did not need to engage in a forfeiture proceeding because the Double Eagles were its own property is a logical box that I, like the Majority, will decline to step into. (*See* Majority Op. at 13 n.3.) That dubious position both assumes the truth of the government's allegation without any requirement of proof and gives the government the power to unilaterally define when there is and is not a forfeiture.

3

file/839521/download. The Manual establishes that deadline for judicial forfeiture because,

> [i]f the Government were to seize property for forfeiture in a situation where administrative forfeiture was authorized, but then ignore the 60- and 90-day deadlines in sections 983(a)(1) and (3) on the ground that it intended all along to skip over the administrative forfeiture process and proceed directly with a judicial forfeiture, courts might suspect that the Government was actually conjuring an ad hoc excuse for missing the statutory deadlines, or had decided to bypass the administrative forfeiture proceeding for the express purpose of circumventing the statutory deadlines and the underlying congressional intent.

*Id*. at 57. That is an insight worth mulling over.

The Majority's careful distinction between a "seizure" and a "forfeiture" – that the former transfers possession while the latter transfers title – is certainly correct. (Majority Op. at 18-19.) But a seizure will often be a component of a forfeiture. And that distinction is of limited utility here, because when the government seized the disputed coins it simultaneously asserted that it had no intention to seek forfeiture since it already had title. In other words, the government took possession and, in doing so, asserted title. It is difficult to square the Majority's distinction between seizure and forfeiture on this record, when the government took the coins and said that it had both possession and title. Under these circumstances, the government's claim of

4

ownership and the manifestation of its intent to retain indefinite possession of the coins was, in my view, sufficient to initiate a nonjudicial forfeiture proceeding.

All of this accords with common sense because, in the absence of some clear description of what a notice must contain or how a nonjudicial forfeiture proceeding starts, the reasonable default conclusion is that it begins when the government takes your property and refuses to ever give it back – in short, when there is a seizure accompanied by some manifestation of an intent to claim ownership. I thus am inclined to agree with Judge Rendell that, when CAFRA speaks of a "nonjudicial forfeiture proceeding," it is not referencing some formal administrative action with the trappings of a quasi-judicial proceeding. The statute is using that phrase as a shorthand recognition that law enforcement agencies can and do leave the courts out of the process of taking and keeping property when it appears that no one else is claiming an interest in the property. As the Majority itself recognizes, "[n]onjudicial forfeitures ... 'permit[] the United States to determine whether property in its custody is unclaimed, and, if it is, to take ownership without the trouble and expense of court proceedings.'" (Majority Op. at 15 n.4 (quoting *Small v. United States*, 136 F.3d 1334, 1335 (D.C. Cir. 1998)). I thus do not accept the premise advanced by the Majority that, for there to have been a "nonjudicial civil forfeiture proceeding" in this case, there needed to be some government action beyond the seizure of the Double Eagles and the stated intent to retain possession and ownership of them.[4]

---

[4] This case presents the circumstance of the government both taking possession and asserting ownership,

5

The oddity of the government's decision to initially forgo any approach to a court in this case is that it was apparent from the outset there were claimants to the property in question. Laying claim to the Double Eagles without going to court was thus a bad idea from the start. Most every government agency involved here – the U.S. Attorney's Office for the District of Columbia, the Secret Service, and the Department of the Treasury – seemed to share that view. Every agency except one: the Mint. A nonjudicial approach to resolving the dispute over ownership should not have been the option chosen by the government, and, indeed, the District Court determined that the government's actions here violated the Langbords' constitutional rights, concluding "that the Government's belief that the coins had been stolen did not diminish [the Langbord's] Fourth Amendment rights and did not change the nature of the Government's seizure." (App. 153.) That conclusion has not been challenged on appeal and it is supported by the record. The District Court then faced the difficult decision of determining how to remedy the constitutional violation while giving both the Langbords and the government the day in court that should have been sought in the first instance. The Court's decision requiring the government to "promptly initiate a forfeiture action" may or may not have been appropriate under the circumstances, but the government's handling of the dispute was clearly ill-advised. (App. 157.) The safe and sensible choice would have been to comply with CAFRA.

which makes the outcome all the clearer to me. But if the government had simply said "we've got the coins and we're keeping them," without reference to ownership or title, I do not think that would be any less a forfeiture.

That reasoning leads me also to reject the Majority's characterization of the Langbords' decision to file a seized asset claim as being "incongruous[]." (Majority Op. at 17.) A seized asset claim certainly sounds like the right way to claim assets that the government has seized, so there was nothing incongruous about that step. Nor am I persuaded by the Majority's assertion that the Langbords' "seized asset claim was akin to filing a petition for writ of habeas corpus on behalf of someone not in custody – mismatched and ineffective." (Majority Op. at 18.) To borrow the metaphor, it seems to me instead that the situation is more like one in which the government is keeping a habeas claimant locked in a 6' by 9' room while insisting that he is not really in custody. Just because the government says a person is not in custody does not make it so. Likewise, the government took custody of the Double Eagles and would not return them, so its assertion that what was happening was not a forfeiture of whatever right the Langbords might have had does not make that assertion true. I would not go as far as Judge Rendell in faulting the government for "audacity" (Dissent Op. at 1), but I do believe we have allowed ourselves to be caught in a semantic game in this case. Labeled a "forfeiture" or not, what matters is what happened: the government took the property, claimed ownership, and kept it; the Langbords wanted it back. Resolving disputes like that is what forfeiture proceedings are for. A good argument can be made, and Judge Rendell has made it, that Congress meant for CAFRA to be the first option that the government and claimants turn to when fighting over who gets to keep disputed property.

But the strict deadlines in CAFRA do not always apply and we have reason to question whether they do here. The

7

reason for doubt is not because the government says, "these are ours; you stole them." CAFRA specifically contemplates property stolen from the government as being subject to CAFRA's regime. *See* 18 U.S.C. § 981(a)(1)(C) (stating that property "subject to forfeiture" includes the proceeds of "specified unlawful activity" defined in 18 U.S.C. § 1956(c)(7), which includes the offense of theft of government property under 18 U.S.C. § 641). The reason that the CAFRA deadlines may not apply is, instead, as noted by Judge Rendell, that the Double Eagles may be merchandise valued at over $500,000, instead of being monetary instruments, so they may be statutorily ineligible for nonjudicial forfeiture. *See* 19 U.S.C. § 1607(a); Dissent Op. at 8-10.

No court has yet addressed that question, and it is an interesting one, but, unlike the dissenters, I do not see a need to remand the case for an answer. The unusual facts here provide an alternative basis for affirming the judgment of the District Court. As the Majority notes, the government pursued a proper declaratory judgment action to quiet title to the Double Eagles "*in addition to* the court-ordered judicial forfeiture proceeding." (Majority Op. at 24 (original emphasis).) The government did so under a legal theory independent of its forfeiture claim, "namely, that the Government was attempting to regain possession of what it believed to be its own property." (*Id.*) Because, in these particular circumstances, the District Court was within its discretion in allowing the government to file a declaratory judgment action in addition to (and not in lieu of) the judicial

8

forfeiture proceeding,[5] there is no need for us to assess the propriety of the forfeiture action itself. Even if the government violated CAFRA, the fact that the disputed property (allegedly) belonged to it all along allowed it to seek a separate declaratory judgment in its capacity as the property's purported rightful owner. Given the unusual procedural and factual background of this case, any errors in the forfeiture proceeding did not infect the distinct declaratory judgment action. That is all we need to say, and judicial restraint counsels that we go no further. *Cf. PDK Labs, Inc. v. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("[I]f it is not necessary to decide more, it is necessary not to decide more.") (Roberts, J., concurring in part and concurring in judgment).

In short, because a separate action to quiet title was permissible in this unusual context, we need not venture into the CAFRA thicket. I emphasize, however, that my agreement that there is an independent and adequate basis on which to affirm here should not be taken as an endorsement of the government's ignoring the statutorily provided mechanisms for forfeiture. The approach taken by the Mint is one that ought not be repeated.

I concur in the balance of the Majority's opinion and in its judgment.

---

[5] I fully agree with Part IV.B.3 of the Majority's opinion, which explains why "the District Court committed no error when it allowed the Government to amend its counterclaim" to add the declaratory judgment claim. (Majority Op. at 29.)

9

**RENDELL**, Circuit Judge, dissenting with whom **McKEE, Chief Judge** and **KRAUSE** Circuit Judge join:

      I respectfully dissent from Part IV.A of the majority's opinion. The majority's reasoning as to why CAFRA's nonjudicial forfeiture provisions do not apply here is at best cryptic and, at worst, sets an incorrect and dangerous precedent that would allow the Government to nullify CAFRA's provisions at will. In effect, the majority holds that the Government did not commence a nonjudicial forfeiture proceeding, and thus avoided the dictates of CAFRA, based mainly on its buy-in to the Government's audacity—the Government's say-so that it owned the 1933 Double Eagles and had no intention of forfeiting them. But in reaching this unprecedented result, the majority not only disregards how CAFRA works and what actually happened here, but also renders CAFRA's protections largely meaningless and defies Congress's intent in passing the statute.

## I.

      This case involves precisely the type of situation that CAFRA was enacted to prevent: the Government's seizing and taking ownership of property in derogation of the rights of ordinary citizens. Indeed, Congress passed CAFRA to "level[] the playing field between the government and persons whose property has been seized." *United States v. Real Prop. in Section 9*, 241 F.3d 796, 799 (6th Cir. 2001). To that end, CAFRA imposes deadlines on the Government for commencing a nonjudicial forfeiture proceeding of seized property and for filing a judicial forfeiture action in response to a citizen's timely claim to that property—not to mention deterrent penalties for missing those deadlines.

1

A nonjudicial forfeiture proceeding under CAFRA is not a "proceeding" in the true sense of the word, but, rather, a statutory scheme. That scheme is commenced when the Government seizes property and notifies all interested parties within "60 days . . . of the seizure," 18 U.S.C. § 983(a)(1)(A)(i), that it intends to keep the property as its own "without the trouble and expense of court proceedings," *Small v. United States*, 136 F.3d 1334, 1335 (D.C. Cir. 1998). If no one submits a timely claim to the property in response (known as a "seized asset claim"), the Government can issue a "declaration of forfeiture . . . [that has] the same force and effect as a final decree and order of forfeiture in a judicial forfeiture proceeding in a district court of the United States." 19 U.S.C. § 1609(b). But if someone asserts a timely seized asset claim, the nonjudicial forfeiture proceeding ceases, and the Government has 90 days to file a judicial forfeiture action, 18 U.S.C. § 983(a)(3)(A), in which it then bears the burden of proving its right to the property, *id.* § 983(c)(1). If the Government does not file a timely action, though, it must "promptly release the property . . . and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense." *Id.* § 983(a)(3)(B).[1]

---

[1] The cases cited by the majority, though not decided under CAFRA, confirm that the nonjudicial forfeiture scheme generally operates this way. *See, e.g.*, *Taylor v. United States*, 483 F.3d 385, 387–88 (5th Cir. 2007); *United States v. Miscellaneous Firearms*, 376 F.3d 709, 711 (7th Cir. 2004); *United States v. Dusenbery*, 201 F.3d 763, 765–66 (6th Cir. 2000); *Boero v. DEA*, 111 F.3d 301, 304 (2d Cir. 1997); *Floyd v. United States*, 860 F.2d 999, 1008 (10th Cir. 1988).

The majority ignores how CAFRA's scheme applies here—notwithstanding that the events fit within it in lockstep. The Government seized the 1933 Double Eagles when it failed to honor the Langbords' July 25, 2005, letter requesting their return and instead "decided to keep [them] for [its] own purposes." *Langbord v. U.S. Dep't of Treasury*, 645 F. Supp. 2d 381, 392 (E.D. Pa. 2009). Next, on August 9, 2005, within 60 days of seizing the 1933 Double Eagles, *see* 18 U.S.C. § 983(a)(1)(A)(i), the Government sent a letter to the Langbords notifying them that it intended to keep these items—without a court proceeding—because they *allegedly* "already are, and always have been, property belonging to the United States." App. 823.[2] To be sure, in this letter the Government disclaimed any intent to forfeit the 1933 Double Eagles. *See id.* But this statement alone cannot preclude the letter from constituting notice of the Government's intent to nonjudically forfeit them. *See* 18 U.S.C. § 983(a)(1)(A)(i) (requiring only that "notice shall be sent in a manner to achieve proper notice"); Stefan D. Cassella, *Asset Forfeiture Law in the United States* 173 (2d ed. 2013) ("Section 983(a)(1)(A)(i) is silent as to the content of the notice."). And

---

[2] It is indisputable that allegedly stolen Government property is subject to forfeiture. *See* 18 U.S.C. § 981(a)(1)(C) (property is subject to forfeiture if it "constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)"); *id.* § 1956(c)(7)(D) ("[S]pecified unlawful activity" includes "an offense under . . . section 641 (relating to public money, property, or records)"); *id.* § 641 (criminalizing the theft or embezzlement of any "thing of value of the United States or of any department or agency thereof").

3

in response to this notice, the Langbords filed a timely claim, terminating the nonjudicial forfeiture proceeding and triggering the Government's obligation to file a judicial forfeiture action within 90 days and *prove* its right to the 1933 Double Eagles. But it did not.[3]

The majority concludes that the Langbords failed to trigger the 90-day deadline with their seized asset claim because the Government chose not to initiate forfeiture proceedings against the 1933 Double Eagles. It reasons that "the Government determined that it was not obliged to initiate forfeiture proceedings against the 1933 Double Eagles because it had merely repossessed its own property" and "[i]n

---

[3] Consider what would have happened if the Langbords had not filed a timely seized asset claim but had filed a replevin action a few months after the Government's notice. Despite the Mint's stated position that it was not seeking forfeiture, is there any doubt that it would have argued that the Langbords were barred under CAFRA from claiming the 1933 Double Eagles because they had been nonjudicially forfeited due to the Langbords' failure to file a timely seized asset claim? The Government cannot have it both ways.

Indeed, I suggest that the Mint's statement that it did not intend to pursue forfeiture proceedings meant that it did not intend to file an unprompted *judicial* forfeiture complaint. Every agency involved in this saga other than the Mint advised the Mint that it should bring a judicial forfeiture action from the outset. *See* App. 818. Yet the Mint decided not to do so and instead commenced a nonjudicial forfeiture proceeding by notifying the Langbords that it intended to keep the 1933 Double Eagles without any court proceeding.

4

fact . . . explicitly disclaimed any intent to forfeit the[m]." Majority Op. 16. Instead, the majority notes, "the Government asserted its ownership rights to the coins." *Id.* 17. It thus holds that the Government never took any steps to commence a nonjudicial forfeiture proceeding against the 1933 Double Eagles, and so the Langbords' seized asset claim was "mismatched" and "ineffective," likening it to the filing of a writ of habeas corpus on behalf of someone not in custody. *Id.* 18.[4]

But that approach enables the Government to nullify all of CAFRA's protections merely by asserting its ownership of property and lack of intent to forfeit that property. Congress cannot have intended this result. *See* Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202 pmbl. (CAFRA's purpose is "[t]o provide a more just and uniform procedure for Federal civil forfeitures"); *United States v. Khan*, 497 F.3d 204, 208 (2d Cir. 2007) (Congress passed CAFRA "to deter government overreaching"); *United States v. Martin*, 460 F. Supp. 2d 669, 672 (D. Md. 2006) ("CAFRA was enacted in 2000 to curb what Congress perceived as abuses of the existing civil forfeiture system."). Rather, to stay true to Congress's intent, we must focus on what actually occurred here: the Government seized property that is, by statute, subject to

---

[4] The majority's second line of reasoning relies on two cases, *Mantilla v. United States*, 302 F.3d 182 (3d Cir. 2002), and *United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141 (3d Cir. 2003). These non-CAFRA cases support the unremarkable proposition that a seizure does not necessarily commence a forfeiture proceeding, and they do not determine the outcome of this case.

forfeiture, *see supra* note 2, with the intent to keep that property permanently and without a court proceeding, and so notified the Langbords. Clearly, then, a nonjudicial forfeiture proceeding was in process before the Langbords filed their seized asset claim, which should have triggered the filing of a judicial forfeiture complaint by the Government within 90 days, *see* 18 U.S.C. § 983(a)(3)(A).[5]

Accordingly, because the Government's failure to file a judicial forfeiture action within 90 days of the Langbords'

---

[5] The Government's claim that the 1933 Double Eagles belong to the United States, after all, is just that, and the validity of that claim is the very question to be answered by a forfeiture proceeding, not by the Government's say-so. That CAFRA expressly provides for an "innocent owner defense," *see* 18 U.S.C. § 983(d)(1) (providing that "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute"), drives home that where there is any colorable claim of a legitimate property interest by the claimant-possessor, the validity of the asserted interest needs to be determined through a forfeiture proceeding. Allowing the Government's self-declaration of its own property interest to be conclusive puts the forfeiture cart before the horse. Were it otherwise, the Government might well assert that its pre-existing title to seized property enables it to avoid CAFRA in any number of situations. *See, e.g.*, *id.* § 981(f) ("All right, title, and interest in property described in subsection (a) of this section [i.e., forfeitable property] shall vest in the United States upon commission of the act giving rise to forfeiture under this section."); *but cf. United States v. 92 Buena Vista Ave.*, 507 U.S. 111, 124–29 (1993) (plurality opinion) (explaining that an identical provision in 21 U.S.C. § 881(h) does not confer title until forfeiture has been decreed).

timely seized asset claim barred it as a matter of law from taking any further action to forfeit the 1933 Double Eagles, *see* 18 U.S.C. § 983(a)(3)(B), the District Court erred in permitting the Government to later file its declaratory judgment and judicial forfeiture actions.[6] Instead, the District Court should have ordered the 1933 Double Eagles returned to the Langbords pursuant to the statutory directive. I would therefore reverse the District Court's order.

---

[6] I respectfully disagree with Judge Jordan's view in his concurrence that, even if the Government violated CAFRA's 90-day deadline, it was still permitted to bring its declaratory judgment action seeking to quiet title to the 1933 Double Eagles. He and the majority justify the Government's declaratory judgment action because it was purportedly based on a legal theory independent of the forfeiture claim. At bottom, though, in both claims, the Government sought to quiet title to the 1933 Double Eagles. *See United States v. McHan*, 345 F.3d 262, 275 (4th Cir. 2003) ("[T]he purpose of a quiet title action is to determine which named party has superior claim to a certain piece of property." (internal quotation marks omitted)). The forfeiture claim and declaratory judgment action were thus "essentially predicated upon the same cause of action," *Algrant v. Evergreen Valley Nurseries Ltd. P'ship*, 126 F.3d 178, 185 (3d Cir. 1997), and because the Government was not permitted to "take *any further action to effect* the civil forfeiture of such property," 18 U.S.C. § 983(a)(3)(B) (emphasis added), as a matter of law it was not allowed to circumvent CAFRA's 90-day deadline "by '[d]raping [its] claim in the raiment of the Declaratory Judgment Act,'" *Algrant*, 126 F.3d at 185 (quoting *Gilbert v. City of Cambridge*, 932 F.2d 51, 58 (1st Cir. 1991)).

7

## II.

But we must address another issue as to the applicability of CAFRA's nonjudicial forfeiture provisions here. Even though the Government's seizure and notice usually commence the nonjudicial forfeiture scheme, some property is ineligible for nonjudicial forfeiture. The Government has urged that the 1933 Double Eagles are ineligible for nonjudicial forfeiture because they are "merchandise" whose value "exceed[s] $500,000" and not "monetary instrument[s]." 19 U.S.C. § 1607(a); *id.* § 1610. If that is true, the Langbords' seized asset claim would have been ineffective to trigger the 90-day deadline. *See* 18 U.S.C. § 983(a)(2)(A) (claim can be filed only by a "person claiming property seized in a nonjudicial civil forfeiture proceeding"). And, thus, the judicial forfeiture initiated by the Government in 2009 would have been timely because § 983(a)(3)(A) did not apply.

This issue should give us pause. The definition of "monetary instruments" includes, among other things, "United States coins and currency," "travelers' checks," and "bearer securities." 31 U.S.C. § 5312(a)(3). Did Congress intend that "monetary instrument" should encompass only currency in circulation and liquid assets that constitute substitutes for currency? *See* H.R. Rep. No. 91-975, at 22 (1970) (discussing a statute requiring domestic financial institutions to report certain transactions involving "monetary instruments" and stating that "[i]t is not the intention of your committee . . . that [monetary instruments] be expanded any further than necessary to cover those types of bearer instruments which may substitute for currency"). On the other

8

hand, the 1933 Double Eagles are rare, uncirculated coins whose seemingly immense value derives from their status as collector's items. Viewed in this way, they would be not monetary instruments but, instead, merchandise possibly worth over $500,000, which is ineligible for nonjudicial forfeiture.

This is a threshold issue that must be decided—one that cuts to the very applicability of CAFRA's nonjudicial forfeiture scheme.[7] Nevertheless, although it was presented to the District Court, it was never addressed there, let alone decided. We should therefore remand to the District Court for it to make the initial ruling on this issue.[8]

Thus, I urge that CAFRA's nonjudicial forfeiture scheme was set in motion here and would require that the 1933 Double Eagles be returned to the Langbords under 18 U.S.C. § 983(a)(3)(B). But that result should follow only if the District Court decides that CAFRA's nonjudicial forfeiture scheme even applied to them. I suggest that remand

---

[7] *See, e.g.*, *In re Funds on Deposit*, 919 F. Supp. 2d 169, 174–75 (D. Mass. 2012) (holding that CAFRA's nonjudicial forfeiture scheme did not apply because the Government seized property that was ineligible for nonjudicial forfeiture under 19 U.S.C. §§ 1607(a) and 1610).

[8] The District Court would decide (1) whether the 1933 Double Eagles are merchandise or U.S. coins and currency; and (2) if merchandise, whether they are in fact worth over $500,000. While there is evidence in the record suggesting this valuation, it was never an issue that was vetted or decided in the District Court.

is the appropriate disposition in the first instance and, therefore, respectfully dissent.